Robert J. LANDMAN et al.

v.

M. L. ROYSTER, etc., et al.

Civ. A. No. 170–69–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Oct. 30, 1971.

Philip J. Hirschkop, Alexandria, Va., for plaintiffs.

Andrew P. Miller, Atty. Gen. of Va., G. R. Humrickhouse, Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

This class action by prisoners of the Virginia Penal System is brought against defendants charged with the powers and duties encompassing the maintenance and supervision of the correctional system of the Commonwealth of Virginia. The jurisdiction of the Court is acquired pursuant to 28 U.S.C. §§ 1343(3), (4), 2201, and 42 U.S.C. §§ 1981, 1983, 1985.

Defendants named in the complaint, or their successors, are the Director of the Department of Welfare and Institutions, the Director of the Division of Corrections, the Superintendent of the State Penitentiary, and the Superintendent of the State Farm.

Plaintiffs, who are representative of the class they purport to represent, mount their attack upon the administration of discipline within the prisons: the reasons for invoking sanctions, the adjudication process, and the various penalties imposed. The evidence adduced has disclosed as to each of these points a disregard of constitutional guaranties of so grave a nature as to violate the most common notions of due process and humane treatment by certain of the defendants, their agents, servants and employees.

One of the principal issues before the Court has to do with lack of appropriate due process prior to punishing members of the class for supposed infraction of rules. As the Court has already indicated, it finds that in many instances punishment has been of such a nature as to be abusive and violative of the most generic elements of due process and humane treatment.

Of necessity the Court must herein set out an extensive review of the testimony to illustrate the existence of what the Court finds to have been a consistent course of conduct by prison administrators and those beneath them, resulting in the denial of the fundamental elements of due process.

A prefatory remark is due on a point of terminology. The good conduct allowance—"good time"—is a credit of ten days against one's sentence for each twenty days served without a rule infraction. Va.Code § 53–213 (Supp.1970). The Director of the Department of Welfare and Institutions is empowered to impose forfeitures and restorations of accumulated good time. Va.Code § 53–214 (1967 Repl. Vol.).

"C-cell" inmates at the Virginia State Penitentiary and occupants of other "segregation" units there and at the Virginia State Farm enjoy substantially fewer privileges than men among the general population. Prisoners in C-cell cannot be employed in any work program; thus they are denied the opportunity to earn money. A reduced diet—two meals a day—is served. Religious services and educational classwork are unavailable, although men may be visited by a chaplain. There is no access to a library, although the men can receive magazines (under a recent change in rules) and books. The likelihood of release on parole is almost nonexistent for men placed in C-cell, and in practice there is no chance that lost good time will be restored. In addition, showers are permitted only at weekly intervals instead of daily, and men in some segregation units are unable to exercise outdoors.

In the Virginia penal system there are five major units and about thirty smaller correctional field units. About 1100 inmates, all felons, are housed in the maximum security Virginia State Penitentiary, located in the City of Richmond. The Virginia State Farm, a medium security facility, holds about 1200. The Virginia Industrial Farm for Women contains about 300 inmates. Southhampton and Bland Correctional Farms each hold about 450. The combined Correctional Field Units, minimum security institutions, hold some 2200 inmates. There are about 30 of these "road camps;" the permanent ones house about 80 to 90 men, and the semi-permanent units contain 50 to 60.

The volume of testimony concerning rules generally covering sanctions and their application in specific instances is immense. Even allowing for the changes in policy which no doubt took place over the time period—over two years—embraced by the deposition and ore tenus evidence presented, the Court has observed a disturbing number of inconsistencies in the officials' accounts of applicable rules. These factfindings must be read, and compared with the evidence, with the awareness that when it is said

that a given disciplinary procedure is followed, the Court is speaking of theory and not necessarily practice, and, at that, theory as expressed by the most apparently authoritative individual.

There was at the time the Court heard this case no general, central set of regulations for the penal system stating which offenses justify the taking of a prisoner's good time or his commitment to a solitary cell.

As of July, 1970, according to depositions then taken, the Superintendent of the Virginia State Penitentiary was empowered to take a man's good time in any amount on the recommendation of a disciplinary committee. No guidelines exist for the penitentiary fixing the range of penalties available for particular infractions. Men in C-cell maximum security section seem generally to be ineligible for restoration of good time. For men among the general population there is a rule of thumb that good time cannot be restored unless a man has served at least twelve months without an offense.

The disciplinary committee does not call as a witness the guard who reported an offense. Needless to say, cross-examination is therefore impossible. No written charges are served on the prisoner before or after the proceedings, and lawyers may not participate. The committee does not make factfindings. No formal appeal procedure exists.

The Disciplinary Committee jurisdiction, in late 1970, was extended to cover offenses committed in C-cell. It now, therefore, generally hears as well any charge that may result in solitary confinement. The question whether a man should be placed in C-cell in the first instance, however, is not always determined by a disciplinary committee hearing. This decision may be made by the Superintendent alone.

Once he is in C-cell, a man's release to less rigorous quarters may be gained by means of a recommendation to W. K. Cunningham, Jr., Director of the Division of Corrections, by a committee composed of the Penitentiary Superintend-

ent, Assistant Superintendent, and two high guard officers.

As of July, 1970, a C-cell inmate could be moved by a guard into meditation without a hearing. Only the Superintendent or Assistant Superintendent could order the man's release. A guard could request leave to keep a man in solitary for more than 30 days, in which event a written report by the guard was to be passed on to Cunningham who, on the basis of the report, would approve or disapprove the request. The meditation cells measure about 6½ feet by 10 feet and contain a mattress (at night), a sink and commode. The usual C-cell diet is served, although bread and water is reserved as a selective form of additional punishment. A man may also be denied use of his mattress for up to about three days as a form of penalty, in which case he sleeps on the bare cement with a blanket.

If a penitentiary prisoner is continually obstreperous in solitary, there is no further method used to control him other than by chaining or tear gassing. On occasion a man's clothing may be taken if he appears to be a suicide risk or a menace to others.

Transfers from the general population to C-cell, since at least 1969, were in theory made only on the recommendation of the disciplinary committee to the Superintendent. Peyton, the Superintendent in February of that year, said, however, that such a transfer, made solely on the recommendation of the Assistant Superintendent, would not necessarily violate regulations. It was his practice, he said, to interview all prisoners in C-cell every six months to determine whether a return to general population was indicated. Criteria determining the decision to place a man in C-cell or remove him were extremely hazy. A man's attitude, his disruptiveness, tendency to challenge authority, or nonconforming behavior, as reflected in written or oral guards' reports, may condemn him to maximum security for many years.

In 1969 C-cell inmates' offenses for which good time might be lost were

"tried" usually by the Assistant Superintendent on the record of a guard officer's report.

In the penitentiary the B-basement category of punitive segregation was instituted in September of 1968. Superintendent Peyton himself selected the inmates who were to be placed there. Conditions there were substantially as in C-Building, but somewhat more restrictive. For several months, for example, B-basement inmates were not permitted outdoors for exercise.

Isolation of prisoners in maximum security cells of this sort has often been effected without any formalities. No investigation was made into Leroy Mason's responsibility for a prison work stoppage, yet for that reason, apparently, he was placed in C-cell for nearly two years. As a matter of practice no hearings were held, according to Oliver, when he was at the Penitentiary, on the question of transfers into C-cell, and inmates were held there at the discretion of himself and the then superintendent, Peyton. Generally speaking these two administrators relied exclusively upon written reports submitted by the guards in retaining men such as Mason, Landman, Hood, and Arey in maximum security units. Elaboration as to the Court's findings as to each of these men will be set forth in later paragraphs.

The Assistant Superintendent at the Penitentiary may "padlock" a man without any hearing for any length of time.

In the penitentiary it appears that several disciplinary sanctions are imposed by guards acting alone, or with the permission of the officer in charge. Meditation prisoners lose their mattresses for misconduct, for example. Mechanical restraints such as chains, tape, and handcuffs are placed on rambunctious inmates by guards. At least once an inmate was taken directly to meditation from death row by a guard captain. Several times fines have been imposed by guards. Furthermore, one Captain Baker has both charged inmates with offenses and sat on disciplinary committees which sentenced them to meditation.

Superintendent R. M. Oliver described the punishment procedures which prevailed at the Virginia State Farm in December of 1970.

There are 32 solitary cells at the southside part of the State Farm, and 16 at northside. Permissible punishment, without special authorization by the Director of the Division of Corrections, is 30 days' confinement. Prisoners are given a mattress at night only; during the day they sit on the floor or on the toilet bowl. Two meals per day are served. It is standard fare, save that no beverage, dessert, or second helpings are provided. Prisoners in solitary cells could not initiate legal proceedings nor answer any letters save those concerning pending proceedings or family crises.

Confinement under this regimen is directed only by a disciplinary committee composed of a guard lieutenant, Assistant Superintendent Jackson, a guard captain, and Mr. R. O. Bennett. The group meets as soon as possible after the offense, preferably within 24 hours. Mr. Oliver stated that he would object to assistance by lawyers at such hearings and likewise to lay counsel's presence as encouraging excessive "hassling." He would not object to using written charges in cases of serious offenses but saw no need for written factfindings.

At the State Farm a prisoner may be taken by a guard directly to a solitary cell if he is incessantly disruptive. In any case, however, a hearing by disciplinary committee is held within 24 hours of the alleged offense. At least since February of 1969, a committee has met on questions of good time loss, which they might recommend to the superintendent, and transfers to maximum security.

Confinement to maximum security areas at the State Farm (formerly C-5 now M Building) entails a reduced diet, rationalized on the basis that the inmate is not working, weekly showers only, and no outdoor exercise.

At the State Farm, testified Assistant Superintendent Jackson, no prisoner would be confined to meditation without a hearing before himself. Once at least, he said, he placed a prisoner in meditation not for violation of any regulation but because he was mentally incapable of abiding by rules governing life in the general population.

Solitary confinement cells at the State Farm are similar to those at the Penitentiary. The bread and water regimen is now very rarely used, and meditation inmates have not in recent years been deprived of clothing as a type of punishment. Both of these sanctions, however, are held in reserve.

Current practice on good time loss is for the disciplinary committee to forward its recommendation that a man lose good time to the Superintendent. That officer almost invariably approves the recommendation and determines, all on the basis of written reports, by how much time a man's sentence should be lengthened. No specific guidelines prescribing penalties for various offenses exist.

The Assistant Superintendent of the Virginia State Farm may place a man in confinement in his own cell—"padlocked"—without a hearing. This is usually done on a guard officer's recommendation. There is no maximum term.

As of July 1970, the Superintendent of one Field Unit had four men in solitary for various offenses, such as general "misbehavior." While this witness' testimony was to some extent inconsistent and contradictory, the Court concludes that men at this particular Field Unit have been jailed summarily, without a hearing, on the authority of either the Superintendent or a guard. Such solitary confinement has been for an indeterminate period in the sense that as of the time of the taking of evidence in this case the witness could not say for how long those then in solitary would be so confined. In at least one instance a hearing of sorts was held in the Superintendent's office in which one of the men who sat in judgment of the accused prisoner was the guard who had accused him.

This witness also said that no particular standards governed his requests that good time be taken. No hearings are held at which the men are allowed to disprove the information on the basis of which good time loss is recommended.

In 1969, one Reynolds, Superintendent of Field Unit No. 9, stated that he permitted men in meditation to write an attorney whenever they wished, even when held in isolation cells. Whenever an offense meriting taking good time was involved, he said, he would call the inmate accused before him; he did not mention that a formal hearing was requisite.

At Bland Correctional Farm, disciplinary proceedings are conducted by a committee including the Superintendent, Assistant Superintendent, and a captain of the custodial force. Good time forfeiture is often haphazardly administered. After one incident including a sitdown strike involving several inmates, the Superintendent docked several participants all their good time, despite that some had accumulated far more than others, and even though in professed theory the amount forfeited is related to the gravity of the offense. At the hearings inmates were not informed of their right to present evidence by witnesses.

The Superintendent of Unit 7 confirmed that on one cold day when several inmates declined to work, some were given the choice of road work or solitary confinement. One Wade Thompson was sent to solitary. A prisoner named Melton, who the witness felt had instigated or agitated the strike, was also sent to solitary. No firm evidence lay behind this finding of "agitation" by Melton. Nevertheless the man was kept in jail and put on a diet of bread and water for two days out of three because the administrators disapproved of his "attitude." Although permission is nominally required for extended "jail" terms and bread and water, Blankenship, the Superintendent, did not secure this before the extra sanctions were imposed.

Good time also was taken. This witness stated that he had never held a formal hearing of any sort on restoring lost good time, and the Court so finds.

Good time administration in the field units is in the control of D. P. Edwards, Superintendent of the Bureau of Correctional Field Units, who acts on the basis of written reports and recommendations by the disciplinary courts in the various field units. A guard is often one member of the court panel, although theoretically not the man who reported a violation. Procedure is not fixed by written rules, but the practice prescribed for field units does not provide for a written notice of charges but does allow some cross-examination and the presentation of a defense. This code of practice is passed on by word of mouth to camp superintendents at regular meetings.

A man at a field unit who claims to be ill will be taken to a doctor at his request; there is, however, no provision for regular visits by doctors to some units, much less to men in solitary. There are no medical staffs at any field units.

A prisoner who escapes, or attempts to escape, is automatically docked all accrued good time when he is recaptured, whether or not he is tried and convicted, and he is not considered eligible for restoration of that credit. When a prisoner is put in solitary he some times stops accruing good time and some times does not, depending on the administrators' view of his attitude.

Certain principles with respect to discipline apply throughout the Virginia Penal System in theory. There have been, however, no general rules which establish those offenses for which commitment to solitary confinement or the taking of good time may be imposed.

Confinement in meditation is ordered by the institution superintendent or assistant superintendent after a hearing. One of these officials and one or more of his subordinates hear the case. In theory the complaining officer presents his charge in the inmate's presence, and then the presiding hearing officer asks the convict to make a defense or explanation. The prisoner may then depart while the disciplinary committee discusses the case. Subsequently a decision is announced.

The prisoner about to be tried is not given a written notice of the charge he faces. Only custodial personnel sit on the disciplinary boards. No explicit recognition of the prisoner's right to cross-examine exists. After the hearing no written factfindings are made or given to the prisoner. No particular process for appellate review exists, although one can complain by letter to higher officials.

Before his hearing an inmate, if considered violent, may be held in a detention lockup on a guard's authority, but in theory no guard may commit a man to meditation. Nor does an accusing guard sit on the adjudicatory panel.

No lawyer or lay assistant is permitted to represent or advise an accused prisoner. These rules also govern proceedings resulting in a recommendation to deny good time. There are no procedures set up to review requests to restore good time.

Until very recently, an inmate in solitary confinement was subject to almost total restriction of his correspondence privileges. On entering meditation he might send a form letter to his family explaining his status and that he could not correspond or receive visitors. The man could receive mail from an attorney, however, and correspond with counsel concerning pending litigation only. He could not file suit.

Meditation cells are equipped with a mattress at night only. No man in theory is fed on a bread and water diet save with the permission of the Director of the Division of Corrections. A doctor's approval is not required, however, and this practice is authorized on the basis of brief written requests. A man in meditation is alone, save when overcrowding requires the placement of more than one man in an isolation cell. The only reading matter is a Bible.

The use of further restraints such as chaining or gagging is not covered by regulation, but is left to the discretion of the unit superintendent. Cells almost uniformly are equipped with a sink and a commode. No specific regulation allows inmates to have a toothbrush, toilet paper, soap, and so forth. Most are given a towel. They are permitted to shower and shave once a week only. A doctor does not regularly visit men in solitary cells. In the penitentiary a man will be examined by a doctor only if the male nurse—a former military medical corpsman or man of equivalent training—recommmends that he be taken to the hospital.

W. K. Cunningham, the Director, testified that no intelligible guidelines govern the taking of good time, save that escapes and escape attempts always result in full forfeiture. He could not recall any instance of his overruling a superintendent's decision to take good time. Field Unit superintendents forward their recommendations to Mr. Edwards, the overall superintendent of field units; he usually follows their lead. The individual unit superintendents are for the most part former guards who worked up through the ranks, and not all are high school graduates; in fact a majority are not.

The great majority of prisoners have lost good time restored to them, according to Cunningham; nonetheless he testified that in the last eight months of 1970 only one penitentiary inmate received such grace.

Disciplinary boards have at times included the accusing guard. Furthermore, although representation by another is forbidden, the Director testified that some inmates are so very dull mentally that they probably cannot properly present their case.

Good time has been taken in amounts at least as large as one year on the basis of the briefest of guards' reports. Maximum security confinement has often been imposed out of unsubstantiated fear, suspicion, or rumor. In some cases this form of detention has been used for prisoners who were simply too feeble minded to adhere to the usual prison routine.

On October 1, 1970, less than two months before trial on this case, Division Guideline 800 was put into effect. These regulations, as adapted to cover all institutions, govern inmate discipline. They are set out in full in a footnote. These were the first substantive regulations on the subject put into effect in the Virginia penal system.

The new guidelines require a three to five member "adjustment committee" composed "normally" of department heads or their assistants. A counselor—a social worker assigned to one of the large institutions—may be present if one of his charges is accused.

There is provision for notice of charges to the inmate, although not in writing. The inmate is put in "detention" pending hearing, which takes place within 48 hours. There is some vague provision for witnesses and cross-examination, at the discretion of the committee chairman. The result of the hearing is recorded and transmitted to the Superintendent for "review and approval;" whether that officer can reverse a not guilty verdict is unclear.

The new regulations do not forbid a charging officer from sitting in judgment. Presumably this practice will be disapproved in theory, as in the past. In practice, however, an accusing official has sat on the panel; Assistant Superintendent H. P. Jackson of the State Farm has done so numerous times.

Offenses are described only as major or minor misconduct. There is no apparent restriction on available penalties, save that corporal punishment is outlawed, and described "minor" penalties can be imposed by a guard supervisor, with appeal to the committee.

The guidelines place conditions on the use of solitary confinement cells. Normal practice will be to permit an inmate to keep his usual clothing. The cells are to be lighted and heated, and occupants receive something to sit on in the

daytime. Mail is not substantially curtailed, and "jail" terms are limited to 15 days. However, a "supervisory officer" may direct the removal of all furnishings and clothing from the cell if the inmate is "destructive," and a man can be kept in isolation longer than 15 days at the order of the Director. Alternatively, he may be placed in a maximum security cell "until he can, with reasonable safety, be returned to the general population."

Forfeiture of good time is imposed on the recommendation of the adjustment committee to the institutional superintendent. That official withholds his decision for seven days while the inmate presents his case to him in writing. There is no procedure established to cover the restoration of lost good time, although the discipline board may "set new behavioral goals * * * and offer restoration of good time." Final authority to restore credit, however, seems to rest in the superintendent, as it did previously.

Procedure for transfer to maximum security facilities is not established, although there is provision for a "formal review" every 120 days of each inmate's "behavior and attitude."

Finally there is a saving provision reserving full authority over disciplinary matters in the Director.

Copies of these regulations were not sent to inmates.

The rules do not seek to define offenses. As before, inmates may be penalized for "abusive language," a term particularly vague in its content in the prison milieu, where the norms of polite conversation do not prevail. Whether language is "abusive," according to Cunningham, depends a great deal on the tone of voice or manner in which words are spoken. In the past, nevertheless, men have been punished for "abusive language" on the basis of written guards' reports which sometimes did not even report the words spoken.

"Insubordination," "insolence," and "sarcasm," likewise offenses, are also un-

defined; their substance is left to the judgement of administrators. A superintendent also may penalize men for "poor work" and "disrespect" if their conduct is such, in his opinion.

Whether a man has in fact attempted to escape or has escaped will be left to the determination of the adjustment board and the superintendent, as before.

"Agitation" is also undefined. Cunningham states that it consists of influencing others to do illegal things, or acts which would be disturbing to the institution. Guards' reports, however, occasionally give no specifics as to the acts constituting "agitation."

No maximum time of padlock confinement is fixed by the new rules. Cunningham stated that the decision to padlock a man must be made by an official of the office of Assistant Superintendent or higher, but the "minor misconduct" provision appears to allow the chief guard officer to impose this penalty.

The guidelines make no reference to the practice of imposing fines. In the past this has been done summarily by guard officers.

Maximum and minimum amounts of good time that can be taken for various offenses are not set forth. As before, these will be governed, under guideline 800, by patterns and rules of thumb passed on orally. Moreover in practice a superintendent's decision to take or restore good time will not be effectively appealable. At most correctional field units this means that the ruling will be made by a man without a high school education or any special training in the goals and techniques of penology.

Guideline 800 also authorizes a continuation of the practice of confining mental defectives in the maximum security segregation cells. The inmates Elbe and Gonzales were referred to C-5 segregation at the State Farm for the offense of having insufficient mentality to participate in ordinary prison business. This is still authorized for those who "cannot safely function in the regular inmate population."

Regular appeal procedures are not established. In the past prisoners aggrieved by decisions against them have been able to "appeal" to the institution superintendent or the Director, by writing a letter. Review, however, has been highly informal, and the Director has not hesitated to go outside the record to secure information on a man's behavior both in the incident in issue and in the past. Never, however, has he reversed a superintendent's decision to take good time.

The Court finds that the reserved powers clause would retain for Cunningham the power to take good time without a committee hearing, to place someone in a solitary cell without a statement of reasons, and to keep a man in maximum security indefinitely on his sole order. Despite that according to Guideline 800 a normal diet is served in isolation, the director may still nonetheless impose a bread and water menu. Moreover, even the adjustment committee may extend a man's term in "jail" if it finds that he committed a second offense during his first fifteen-day term.

Cunningham had formed no fixed opinion on whether counsel should be admitted to the disciplinary committee hearings. He thought that lawyers might be unfamiliar with the goals and means of penology, even by comparison with some of the guards. The director had no objection to the presence of lay counsel, however.

Going to the Court's findings concerning not only the named plaintiffs but others of the class, the Court makes the following additional factual findings:

ROBERT JEWELL LANDMAN

Landman, a prisoner now released from the Virginia system after having served his full term on August 28, 1970, had been technically eligible for parole for six years prior to his release.

Commencing in 1964, Landman embarked upon a career, well-known to this Court, as a writ-writer. The evidence before the Court is that between that time and the time of his release, on be-half of himself he filed a minimum of 20 suits, and it is estimated that in addition he assisted fellow inmates in approximately 2,000 other petitions.

Landman's troubles with the prison authorities apparently commenced with his having written a letter to one of the local newspapers, for which he served 20 days in solitary confinement. This was followed with correspondence to the then Governor, and in 1964 he was sent to what is known as the "C" Building and placed in punitive segregation where he was held for a period of 150 days. He was removed from there and put in the general population until January 1965 when he was moved to a prison camp. His move from the penitentiary to the camp came the day before he was due to confer with a local attorney.

His reassignment to the penitentiary from the camp undoubtedly came about by reason of his having by then commenced his writ-writing endeavors, and in may 1965 it was recommended that he be placed in the "C" Building for his efforts in that regard. In "C" Building his life appears to have been a series of transfers to and from solitary confinement. In at least one instance he was put in solitary confinement for 58 days and never given any reason whatsoever for this confinement.

Apparently for assisting another prisoner in preparing a writ in 1966, he was once again put in solitary confinement.

This Court finds that up to November 1966, the man was punished 16 times and had good time taken from him once. He served a total of 266 days in solitary confinement and 743 days on padlock.

In August of 1968, this Court entered a consent injunction enjoining the prison officials from denying inmates of the Virginia State Penitentiary certain of their rights. The day following the injunction, Landman was once again put in solitary confinement for a period of 40 days, allegedly for conferring with another prisoner. Landman's attempts to contact his lawyer were to no avail. From March 15, 1969, to July, Landman

was placed on what is known as "padlock," wherein a padlock is placed on a particular cell so that when all other cells are opened electronically, that particular cell remains closed.

In short, the Court finds that there was imposed upon Landman over 265 days of solitary confinement and in no instance did he receive even the rudimentary elements of a hearing or opportunity to defend any allegations made against him. The Court is satisfied that Landman's exercise of his right to file petitions with the courts, and his assisting other prisoners in so doing, were the primary reasons for the punishments put upon him.

## CALVIN M. AREY

Arey was placed in solitary confinement on December 6, 1965. Although the record is devoid of any accounts of violence on the part of Arey, he had with justification been considered an escape risk and remained in "C" Building for a period of more than 4½ years until released into the general population in July 1970. At least twice while in maximum security he was placed in solitary confinement, one of the times for allegedly discussing with Landman an order of this Court, and he, like Landman, was transferred to solitary confinement for a period of 42 days during which time neither of them was permitted to file legal pleadings or to send letters to courts or attorneys; and in one instance he was placed in solitary confinement for reading to inmates a letter that he had received from a state senator. No notice or hearing of any kind was held in regard to these punishments, nor in regard to his loss of good time which he sustained. It would appear from the evidence that Arey's good time was taken on the basis of information received from a guard and upon the recommendation of the Assistant Superintendent that his good time be taken. Not even the rudimentary elements of a hearing or opportunity to be heard was given this man prior to the taking of good time.

■ The fact that some of the matters which gave rise to the many punishments received by Arey may well have been factually accurate can in no way be used as an excuse for the failure to accord him due process.

The record abounds with evidence of Arey's attempts to communicate with attorneys, only to be subjected to delay or frustration. In at least one instance Arey was forbidden by the Superintendent to communicate with an attorney who was not then currently representing him. Perhaps the most striking example of the indignities suffered by Arey is exemplified by an incident which occurred on August 13, 1968. On that day radio news reports gave an account of this Court's injunction against the employment of certain methods of punishment in the state prisons. According to punishment reports submitted by guards, Arey yelled to other inmates concerning the Court order, telling the population of "C" Building generally that tear gas and the taking of bedding had been prohibited. Arey's commitment to solitary for this was approved by Superintendent Peyton who, so far as the evidence before this Court shows, failed to check out the account of the occurrence with anyone who had been allegedly present. The prison records as to this incident show the spaces on the form designed to record the members of the disciplinary panel who heard the case to be blank. Obviously no hearing was held. In fact it was standard practice at that time, the Court finds, to discipline men in C-cell without any hearing. On occasion, according to the testimony of R. M. Oliver, a committee might sometimes be used.

Arey was released from his isolation on September 23rd. That same day he found on his cell cot a letter he had tried to send to an attorney on August 14th; permission to mail it had been refused. He, of course, had been denied leave to write counsel during his solitary confinement.

The record shows that a letter went from Superintendent Peyton going to Di-

rector Cunningham, which indicates as well that copies of this Court's order mailed by an attorney to certain prisoners were intercepted apparently on instructions of an Assistant Attorney General.

It was three days after his release from meditation, where he had not been allowed to shave, brush his teeth or comb his hair, and after having been on a bread and water diet for two days out of three while incarcerated in a cell which contained only a sink and a commode, and, in the night, a mattress and two blankets, that he wrote a letter to a state senator which ultimately was returned to him without having been mailed. The letter, which concerned penitentiary conditions, was taken to R. M. Oliver who disapproved this correspondence. No satisfactory explanation for this action has ever been received.

In 1969 Arey received a copy of a letter from a state senator which he read aloud to another inmate. While there is some dispute over how loud he spoke and what extemporaneous remarks he added, as a consequence a guard filed a punishment report. While no hearing was held, Arey lost all accumulated good time and stayed in meditation until February 5, 1970. The effect of the loss of good time was to extend his term by a year and eleven days.

Arey was kept in C-cell through 1969 and well into 1970. In early 1969 no concrete reason could be given by Peyton as to why Arey was still in maximum security. At least one official testified that it was principally on account of his alleged disruptive, contentious attitude. The same official, however, in conversation with the state senator who visited the prison, stated that Arey's litigiousness was at least a contributing cause for the resolve to keep him in C-cell.

In mid-1969, after J. D. Cox succeeded Peyton as Superintendent, a four-man review committee for the penitentiary recommended to W. K. Cunningham that Arey, Leroy Mason and several others be returned to the general population from C-cell. Cunningham rejected this proposal, and the men were kept in segregation for many more months.

ROY E. HOOD

Hood had been in the penal system continuously since 1963 and in at least two instances escaped from road camps and undoubtedly has admittedly caused difficulty, in some instances, during his stay, although in at least one instance he had been made a trusty. Some of the punishment accorded Hood, such as allegedly for refusal to work, fails to show up on the records kept by the authorities.

While in most instances Hood knew of the reason for a particular punishment, the Court finds that he has been put in "the hole", or solitary confinement, in some instances without benefit of any opportunity to be heard as to whether the punishment was either deserved or appropriate. He has lost good time under the same circumstances.

From January 1967 to November 1968 this particular prisoner was apparently devoid of any particular problems until he conferred with an attorney, and within eight days thereafter he was transferred to the penitentiary. Interestingly enough, the attorney with whom he had conferred was the same attorney who was representing the inmates in their suit to desegregate the penitentiary. The attorney had conferred with Hood and one Lambur, and had asked the prisoners to send him information concerning alleged tear gas incidents which might be useful in a case he was then litigating. The same day of the conference prisoner Lambur was incarcerated in a high security section and, as heretofore stated, eight days later Hood was transferred to the penitentiary and put in a padlocked cell. No satisfactory reason for the treatment accorded these men has ever been given. The response received to his several inquiries as to why he had been accorded the treatment referred to was a brief notation from an official to the effect that Hood knew the answers as well as he did.

The files reflect a letter from the Director indicating that Hood and others had been sent to the penitentiary as a result of "agitation" that they were allegedly committing among State Farm inmates. The evidence before this Court shows that the agitation apparently was Hood's inquiries about tear gas incidents.

On March 31, 1969, guards took an inmate named Hargrove from a cell near Hood in a fashion that Hood thought was rough. On that same day he wrote to an attorney—the same attorney with whom he had conferred at the State Farm—and in this letter he wrote of the alleged rough treatment and remarked about alleged poor medical care. The following day he was placed in B-basement, a high security area. That the prison authorities imposed summary punishment on Hood for exercising his right to communicate with an attorney about conditions of confinement is clear. As a consequence he remained in B-basement for thirteen months.

## LEROY MASON

A named plaintiff, Leroy Mason, admitted to the Richmond Penitentiary in 1965, had no noteworthy clashes with prison authorities prior to 1968. In early 1968 Mason was known by the authorities to have contacted an attorney concerning certain prison conditions, in particular the alleged segregated nature of the State Penal System. In July 1968, while he was working as a Chaplain's Assistant at the penitentiary, there came about an inmates' non-violent strike or work stoppage. The Court finds that Mason had no prior knowledge of the work stoppage.

The then Superintendent, Peyton, suggested that the prisoners go to their respective work places and elect several spokesmen with whom he would confer. Of those spokesmen Mason was elected as an inmate representative, and generally he spoke for those representatives and met with Superintendent Peyton several times, but continued to perform his regular job. By that time Mason was a named plaintiff in a class action

suit pending in this Court for the purpose of requiring a racial desegregation of the Virginia Penal System.

On July 19, 1968, four guards came to Mason's cell, handcuffed him and took him to the isolation cell block in the prison hospital where he remained in what amounted to solitary confinement for approximately a month. It is to be noted that another spokesman, one Pegram, met the same fate. Prison records indicate that the transfer of Mason was allegedly for refusal to return to work, for his own protection, and in an effort to keep him incommunicado. No hearing in regard to this punishment was held and he was kept in an isolation cell for approximately thirty days.

Shortly after being released from isolation he was transferred on August 20, 1968 to the maximum security lockup, i. e. C-cell segregation block, and was held there until April 27, 1970. In addition, it was ordered that he lose ninety days good conduct time.

The Court finds that he was not accorded any hearing, and in addition his release from maximum security had been recommended for some time prior to his actual release from same. The record is devoid of any valid reason as to why he was not released sooner. While the Court is not fully apprised as to the use of punishment report forms in the prisons, it notes with some interest that the report of Mason's August 20th transfer to C-cell was apparently received by the Superintendent's office on August 19th.

While much disciplinary action was accorded many of the prisoners without notice or hearings and for reasons still vague to the Court, and in some instances simply upon the whim of a guard, in the treatment accorded Mason the record is devoid of any justification, and the Court is therefore satisfied that his punishment was attributable to his instituting an action in this Court for purposes of desegregating the Virginia Penal System.

Superintendent Peyton had stated that he could not say for sure whether Mason

had stopped work during the strike. According to Peyton's explanation Mason was put into isolation only to keep him out of danger and contact with other inmates. Yet in spite of the uncertainty expressed by Peyton concerning any alleged work stoppage by Mason, ninety days good time penalty was imposed for allegedly refusing to work.

In late 1969 in spite of recommendations of the prison staff that Mason be released from maximum security, Cunningham refused to go along with the recommendation apparently on the basis of Peyton's reports that Mason had been a strike ringleader. Mr. Cunningham's justification for the continued refusal to air these charges in a hearing was based on the grounds that an emergency condition still persisted at the penitentiary. The proffered justification for Mason's segregation confinement and loss of good time is so specious as to add weight to the Court's conclusion that he had been penalized for his participation in a law suit begun in January 1968 in this Court in which he sought and achieved the desegregation of the Virginia Penal System.

## THOMAS C. WANSLEY

Wansley, serving a life term, had apparently been in no difficulty prior to the strike in July 1968. He, like Mason, was one of the original parties in the suit filed in February 1968, for the purpose of desegregating the penitentiary. Wansley was one of several hundred inmates who refused to work on July 18th at the time of the alleged work stoppage. The Court finds that shortly thereafter he did request an opportunity to return to work. As a consequence of his actions he was placed in solitary confinement from July 1968 to August 1968 and kept in a cell for a period of ten months.

The Court is satisfied that, unlike Mason, Wansley knew of the contemplated work stoppage. It is of particular note that Wansley remained confined for some considerable period after other striking prisoners were returned to their regular duties. It is a fair assumption, and the Court finds, that the reason for this was his actions in the suit to desegregate the Virginia Penal System.

Penitentiary records indicate that the padlocking of Wansley was allegedly for "agitating" by advising other prisoners to file suits contesting their treatment and by telling others, after his return from Court on August 13, 1968, that guards were barred from using tear gas against them and, apparently according to him, would be jailed if they did. Wansley, the Court finds, was never formally confronted with this alleged charge of agitation and never saw the prison reports prior to the trial of this case. In short, he was put under padlock on the basis of reports that he was yelling in the cellhouse and "agitating." The witness Oliver recalled no details save that Wansley had not been violent. Peyton, in February 1969, made no effort to justify Wansley's detention beyond saying "in his judgment" he should be confined.

As already indicated, the trial of the issues before the Court consumed many days of testimony in which the Court heard at least 46 witnesses, including the named plaintiffs, and read designated depositions of others. As one would expect, the witnesses called on behalf of the plaintiff were for the most part prisoners who either were or had been confined in places of incarceration under the jurisdiction of the defendants. The Court is satisfied that the testimony received is representative of conditions existing generally throughout the Virginia Penal System.

The Court has attempted to bear in mind in its ultimate conclusion that the burden is upon the plaintiffs to prove their case by a preponderance of the evidence, and this the Court is satisfied has been done.

The following additional factual findings are intended to be illustrative to the end that the Court's legal conclusions based upon same may be more readily understandable:

## FREDDIE LEE HYTHON, JR.

Hython, a State Farm inmate for approximately six years prior to the date of hearing in this case, refused to perform work at that facility allegedly because another inmate had threatened him and he feared to mingle in the population. He explained his plight to a guard lieutenant and he was forthwith ordered to an isolation cell.

Hython's testimony has been weighed by the Court in light of the Court's conclusion that apparently he was a person of extremely limited intellectual capability. He had had his good time taken from him several times without benefit of a hearing, although he did have at least one hearing concerning good time forfeiture.

## NATHAN BREEDEN

Breeden, a prisoner at the State Farm, was incarcerated in the C-5 high security section at his own request because of his alleged fears of persons in the general population. His testimony was of significance to the Court in that it corroborated the allegation brought out during the trial that it was common practice to place mentally ill inmates in solitary confinement.

While incarcerated in C-5 Breeden witnessed, in a manner of speaking, the death of another inmate, one Philip Lassiter. The Court finds that in late August of 1970, Lassiter was placed in a meditation cell by reason of the fact that he was mentally disturbed and his behavior was sometimes uncontrollable. Breeden, through an inmate named Marsh Whitney, secured copies of records of Lassiter's psychiatric care over the prior three years.

Between August 25th and Lassiter's death, while Lassiter was confined to a meditation cell, he screamed day and night apparently seeking help. Indicative of Lassiter's state of mind was that on that day he plugged the commode in his cell with a shirt, causing the flooding of his cell.

Efforts were made by Breeden to bring to the attention of the prison nurse the records he had secured from inmate Whitney. On August 27th Breeden spoke to a lieutenant and subsequently gave him a copy of what purported to be a doctor's letter diagnosing Lassiter's condition as chronic schizophrenia. On August 29th Breeden wrote to Superintendent R. M. Oliver about the case.

Lassiter continued to scream for help until he died on August 31st. At least four inmates in nearby cells corroborated Breeden's account including the fact that at some point, which the Court determines to be approximately August 26th, at least one guard had an altercation with Lassiter concerning a food tray, during which Lassiter, if not the guard, landed some blows.

It should be noted that Superintendent Oliver said that Lassiter had been placed in solitary confinement at his own request, and while he knew that the inmate was under psychiatric care, he never received reports of Lassiter's alleged screaming.

The Court finds that while it was not the routine practice to put mentally disturbed persons in solitary cells, they were occasionally placed there for want of other space pending commitment proceedings.

## EDWARD R. BELVIN

The prisoner, Belvin, a person with a sixth grade education, had lost 66 days good time for alleged attempted escapes. He was accorded no hearings prior to the taking of his good time. The prison administration simply sent him a "green slip" revising his sentence. As a consequence of these sanctions, 66 days were added to his term.

In April, 1970, Belvin was in the prison hospital for treatment of a nervous condition. On one occasion he threatened to scream if he was not given a shot which he felt he needed. As a result he was taken to a meditation cell without a hearing. There the guards restrained him by handcuffing him and chaining his body to the cell bars. They wrapped tape around his neck and secured that to the bars also. Belvin re-

mained in this position for fourteen hours until a guard cut him down at 4:00 a. m. Belvin was kept nude in a bare meditation cell for seventeen days during April. His clothing was taken because he refused to surrender a food tray to guards.

Guards in the penitentiary have had the authority to chain a violent man until recently; currently it can be done only at the Superintendent's orders. Prison policy, however, dictates that mentally disturbed inmates not be so treated, but rather that commitment proceedings be begun as soon as possible. It is inexplicable why Belvin was placed in an ordinary punishment cell rather than some less brutal form of confinement. He had reportedly twice attempted suicide prior to this episode, yet medical supervision appears to have been lax. The decision to chain him was made by guards, without the prior approval of any doctor, yet this incident did not, so far as the record shows, result in so much as a reprimand for those responsible.

## BARRY CLINTON JOHNSON

Johnson, a prisoner under sentence of death, was placed in meditation three times. In January, 1969, he spent about seven days in meditation for complaining to guards and arguing about officials' treatment of money sent to him at the prison. The guards' reports recount a very poor attitude in making requests and nasty remarks about personnel. No hearing was held; Johnson gathered from a guard that his complaints about his money were cause for his "jailing." Just before his confinement, Johnson filed a complaint in this Court along with one Short alleging mistreatment by guards.

The second time, Johnson was reported as having harassed a guard when he inquired of him about some shirts which another correctional officer had promised him. The week before he had been shot with tear gas in his cell and had written to Philip J. Hirschkop, an attorney in his case, complaining about the incident.

He also encouraged other inmates subjected to such treatment to write Hirschkop. Before his transfer to solitary, Johnson was accorded a semblance of a hearing in that he was taken to a back office and confronted with the charge by three guards, two of whom were officers. The allegedly harassed guard was not present at this hearing to be questioned. The guards sent him to meditation without advising him of the length of his stay.

In July, 1970, Johnson was sent to solitary for loud talking, although the man with whom he allegedly was engaged in loud talking was not punished. One guard, Captain Baker, had previously threatened to punish him for cursing other guards. Another, Gibbs, told him to stop complaining to courts and lawyers or he would be placed in solitary. Johnson was taken to solitary by five or six guards and brought the next morning to the guards' office. There, Gibbs threatened to cut off commissary privileges, hot water, and coffee if he did not cease his complaints. Others accused him of cursing a guard; he denied it, but they refused to check out his story. Less than two weeks before this incident Johnson had written a complaint letter to the Governor of Virginia.

When he was taken to C-cell solitary the third time, Johnson was punched by Captain Baker with a tear gas gun and then, at Baker's orders, chained to the cell bars. This endured for five days. His waist and arms were secured to the bars in such a fashion that he could just barely recline. He was not released in order to urinate or defecate.

At trial there was no cross-examination of this witness.

## SAMUEL MACKMAN

Mackman, a fifteen-year veteran of the Richmond penitentiary, gave accounts of being placed in solitary and losing "good time" for breaking up a fight and for having requested his prescribed medicine. On October 31, 1968, punishment report has it that Mackman threatened to hit a guard, one Catron. This occur-

red, the prisoner said, after Catron shot him with tear gas for failing to eat.

In January of 1969, Mackman lost 90 days good conduct time for "yelling * * * cursing and raising hell." He spent ten days in meditation and received a "green slip" extending his sentence 90 days. No hearing was held.

When the authorities concluded that Mackman in fact had only sought to break up a fight, they restored good time earlier lost. No hearing was held on the charge, however, at any time.

## BERNARD R. BOWSER

Inmate Bowser, serving a five year sentence, has lost good time without any hearing. The Court is satisfied that Bowser, on being placed in meditation, was cognizant of the reason for it as well as the reason for good time being taken. The Court does find that no hearing, in at least several instances, was held with a view to finding the facts.

The same situation exists as to the witness Robert Powell and one Wiley A. Reynolds, another State Farm prisoner who, although he did receive the benefit of one or more hearings, stated the accusing guard was sometimes not present. The Court concludes that the regulations which existed frequently only became clear when one was punished for a violation.

## WADE EDMOND THOMPSON

Wade Edmond Thompson testified concerning discipline in the correctional field units, the state convict road force. At Field Unit No. 27, he was placed in solitary confinement three times.

The first time, in March of 1969, a guard complained of his conduct and he was brought before a lieutenant, acting as superintendent. The complaining guard and a state highway employee were present as well. After about a week Thompson was released from "jail"; he learned sometime later that the charge had been insubordination.

In August, 1969, Thompson, feeling unwell, requested to see a doctor. Instead he was given the option of working on the road or going to solitary. He chose the latter.

In January of 1970, Thompson, having had a series of run-ins with one particular guard, was brought before the Superintendent on the latter's complaint. The guard stated that Thompson had used profane language; another verified this, and the prisoner was sent to solitary by the Superintendent without an opportunity to state his side of the case.

On his request, Thompson was transferred to Unit No. 7 soon thereafter. At that camp, in February of 1970, Thompson and a number of others refused to work when the temperature fell to eleven degrees. Thompson was called into the Superintendent's office. He told that official that he would not work in such cold weather, as he understood he was not required to do, under applicable regulations. He was ordered to solitary confinement, where he spent twenty-four days, without a disciplinary hearing. Some weeks after his release he learned that he had lost sixty days' good time. Conditions in "solitary" were extremely crowded; from four to seven men were put in a one-man cell.

Thompson later went to Field Unit No. 18, from which he escaped. After trial and conviction for this offense, he was also docked eighty days of good time; no hearing was held.

This witness approached the Superintendent of Unit 18 to request another transfer, stating that he had difficulty living under the regulations. As an example, he stated that a guard in the mess hall had once forced another prisoner to eat a raw sweet potato. In response to this complaint, the Superintendent ordered Thompson summarily taken to solitary confinement. While in "jail," Thompson complained of his plight in a letter to Philip Hirschkop, an attorney. The very day that the letter was mailed, he was given a hearing on his infraction by three guards. The charge was "agitating" the inmate who balked at eating raw food. In fact, Thompson never spoke to the man, nor did he tell anyone save the Superintendent of the incident. This

was the only "hearing" that Thompson ever was granted on the issue.

## STANLEY DOUGLAS POWELL

Powell, an inmate of Correctional Field Unit No. 4 for six months prior to trial, stated that he was summarily punished for allegedly cursing a guard. Two days after the offense he was taken aside by that guard, Anderson, and one other; the latter ordered him to strip naked. Lieutenant Anderson thereupon struck him with a nightstick. Powell was taken to a doctor some time later and his head was stitched up. The same day he was taken before the Superintendent and ordered into solitary confinement. At some point during this episode, Powell wrote his brother about the incident. Anderson, having apparently intercepted the mail, called him in and said that if he made no trouble about the beating he need not go to "jail." Powell spent eighteen days in solitary confinement; he never had a hearing, nor was he given reasons for his punishment.

The guard, Anderson, testified that he struck Powell only after being attacked himself. Cunningham stated, however, that it is the policy throughout the penal system that any man who attacks a guard loses all of his good time. This did not occur in Powell's case. The Court rejects the account given by Lieutenant Anderson.

## THOMAS JEFFERSON

Jefferson gave an account of a series of run-ins with authorities in various field units. His innocence of misconduct may be and indeed is open to question; nevertheless the procedures followed in imposing sanctions is not seriously disputed.

At Field Unit 16 he was sent to solitary three times at the order of various guards or guard officers. No hearing or statement of reasons was offered. A bread and water diet was enforced at various times.

As soon as he was transferred to Unit 2, Jefferson was jailed for 31 days for misbehavior without a hearing. Follow-ing an argument with guards in the dinner line, Jefferson was committed to solitary a second time. The guards refused to let him see the superintendent. When he argued, a guard shot him with tear gas and kicked him, although he did not resist. Twice again that day he was tear gassed in his cell. This jail term lasted 56 days, during which Jefferson did not have a shower nor get a change of clothing. In addition, he lost between sixty and ninety days of good time. No hearing was ever held.

Jefferson's reputation as a trouble maker accompanied him to Field Unit 4. Only minutes after his arrival he was jailed for "misbehavior"—cursing a guard. Jefferson, who is black, says this occurred when a white guard called him "boy." No hearing was held on this offense. This was the first of twenty-one terms he spent in "jail" in Unit 4. His offenses included refusing to work, refusing to work in cold weather, and talking to civilians on the highway. For an escape attempt he lost 60 days' good time. No hearings were held in any case, but he knew generally the nature of his alleged offense each time he was punished.

Superintendent Honeycutt of Field Unit No. 2 wrote to D. P. Edwards, Superintendent of the Bureau of Correctional Field Units, after the chow line affair, stating that he intended to keep Jefferson in a solitary cell indefinitely until his attitude toward authority changed for the better. Honeycutt in theory had no power to confine a man more than thirty days, but Edwards made no objection.

## TIM SCOTT

Scott witnessed part of Jefferson's chow line melee. Jefferson was loud, Scott says, but he made no physical threats, nor did he resist physically. Another inmate persuaded him to submit and go to jail, according to Scott's testimony, which the Court accepts.

Scott himself is an adherent of the Black Muslim faith. As part of his religion he must each day wash the ex-

posed parts of his body. At Field Unit 2 he was committed to a solitary cell when he was discovered washing in a basin in the dormitory. A guard, one Wyatt, directed him to stop. Scott protested that he was not breaking any regulation, but continued to wash. The guard drew up a charge and Scott went before the superintendent the next day. That official confronted him with Wyatt's charge and asked why he had not complied with the guard's order; Scott again replied that rules had been posted and no regulation forbade using the basin in the evening. He was sentenced to seven days in jail.

At Field Unit 11, to which he was transferred, Scott at one point asked to see a doctor. He was taken, examined, and returned. A guard lieutenant then brought him some medicine which had been prescribed and told him to take it. Another inmate told him that the "medicine" was suppositories, not to be taken orally; Scott had received no instructions. The lieutenant returned and discovered that Scott had not taken the medicine. After a hearing of sorts before the guards, the details of which do not appear, the prisoner was taken to another camp and put in solitary for nineteen days. On his return to Camp 11 he was notified that he had lost 30 days' good time for "misconduct." He asked the superintendent what his offense was; that officer said that Scott had asked to see the doctor when there was nothing wrong with him and then refused to take his prescribed medicine. Scott infers that he was punished because only a few days before a man in his camp, one Page Early, had died while begging to be allowed to see a doctor, and the authorities wanted to keep the matter quiet. In fact the superintendent and a guard told other inmates that if they tried to get word of Early's death out of the institution and into court they might be put in solitary or lose good time.

Scott's Islamic religion threatened to bring other sanctions upon him. A guard sergeant threatened him with transfer from Camp 2 if he continued to proselytize; a captain directed him to speak to no more than one or two at a time. Such restrictions are not imposed upon conversations on other topics, nor is the use of the washbasin restricted for others as it is for Scott. Cunningham himself said that by Scott's own account he had committed no offense.

## GEORGE D. CEPHAS

Cephas experienced back trouble while assigned to Field Unit No. 26 in July of 1969. The camp authorities had him taken to two doctors on three different occasions. One of these told a guard lieutenant that Cephas should not be assigned to road work; the other confirmed that he needed medication, but that he should work. Some days after his last examination, Cephas had an attack of pain allegedly so severe that he could not get out of bed. The guard captain had him shackled and moved to Camp 30, where he spent twenty-six days in meditation. At Camp 30 Cephas' requests to see a doctor were denied. After his "jail" term he was returned to Camp 26 and reassigned to road work, although the foreman apparently allowed him to do light work. This was Cephas' only offense in prison.

## FREDDIE LEE COLLINS

Collins, who has spent most of his term in Correctional Field Unit No. 2, was placed in solitary confinement three times between November 1969 and April 1970. Each time the charge was poor or unsatisfactory work. No formal hearing was held. Instead he was simply called before the superintendent, who informed him that his guards had reported Collins' misconduct. Collins went to jail. On one occasion the superintendent said merely that "his guards don't lie." During one twenty-one day stay Collins lost twelve pounds.

## DAVID LEON BROOKS

Brooks also was committed to solitary confinement in field units three or four times without a prior hearing. At one time in October 1968, he lost 60 days of good time and was jailed for allegedly

refusing to work. During one period of confinement Brooks was kept nude in his cell for nine days.

## CHARLES LEE MELTON

Charles Lee Melton had a substantial record of infractions at Field Units 2, 31 and 7. "Jail punishment reports" indicate that in most cases the decision to punish was made by a two or three man board, including the superintendent. At Unit 31, Melton said, he was usually given a chance to explain his conduct by Superintendent Sumner.

On December 4, 1968, according to the defendants' records, Melton was jailed for the following reason:

> Offense: When E. Phillips #90872 was put in solitary he said might as well put him in.

Melton was heard on this "charge" by the superintendent alone. Records show that he was not released until March 12, 1969. Until February 12 he received full rations only every third day. Meals the other days consisted of four slices of bread, served twice each day. During the first 32 days of "jail" a window was left open in Melton's cell and snow fell in on him.

From July 29, 1970, through September 15, 1970, Melton was in a meditation cell in Camp 7; during this time his diet was bread and water for two of every three days and his weight fell from 160 to 140 pounds.

After his three month term in meditation had been served in 1969, Melton was transferred to the penitentiary where he was notified that he had lost all his accumulated good time—over twelve months—for refusing to work. No hearing was held.

Testimony by prison administrators illustrated the accuracy of Tolstoy's observations about the limits of bureaucratic power. A specific order invariably deteriorates in content as it travels from chief to subordinates on the line. Higher prison officials, generally speaking, displayed a confident perception of the rules and procedures applicable in various situations. Lower officers who in fact implement the rules were, however, less sure about the regulations governing the prisoners' conduct and their own.

██ The rule for years has been that, absent claims of gross violations of fundamental rights, federal courts will make no inquiry into the manner in which state prison officials manage their charges. McCloskey v. Maryland, 337 F.2d 72 (4th Cir. 1964). It is not difficult to discern the principal rationales for this doctrine. A prisoner after all is presumed to have been justly convicted and sentenced; that presumptively valid judgment imposed a punishment of confinement under certain contemplated conditions. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnstone, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). This is not to say that prisoners possess no further rights to be infringed or liberties to be taken. However, while confined, their fate is by law in the hands of administrators whose acts, like those of most administrative decision-makers, may be presumed legal.

██ Furthermore, courts have, perhaps implicitly, honored the theory of criminal punishment that holds that men who have been found guilty of violations of criminal laws may be utilized, so to speak, by society for ends related to the general welfare, such as the deterrence of similar acts by others and the alteration of their own patterns of behavior. Criminal activity, it is thought, once proved by legal procedures, fairly works a forfeiture of any rights the curtailment of which may be necessary in pursuit of these ends, such as the right of privacy, association, travel, and choice of occupation. Because federal courts have considered themselves both lacking in the authority to dictate those uses to which society may put convicts and without the specialized knowledge to test the necessity of losing certain

liberties to accomplish various goals, they have not generally questioned such deprivations. Even now no court has required that states adapt their penal system to the goal of rehabilitation.

■ Moreover, in a society concededly subject to increasing legal regulations, prisoners more than any others are subjected to state control. State officials govern inmates' lives by a series of decisions on an hourly, indeed continual, basis. Many of their decisions may be subject to more than colorable constitutional attack. If each is to be subject for federal examination of a plenary sort, the energy and time of the federal judiciary and of state penal officials would be diverted to an inordinate extent. Even if the law permitted many such matters to be determined without the taking of testimony, little if any saving in time would be accomplished. Concerns of judicial efficiency must be among the reasons which cause courts to pause in considering whether Congress intended federal civil rights jurisdiction to extend over such claims. See Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971); Weddle v. Director, Patuxent Institution, 436 F.2d 342 (4th Cir. 1970).

■ Nevertheless, whether detention should be imposed at all has always been matter for federal review. In consequence any substantial restriction upon access to a federal forum for examination of the legality of confinement has been barred as well. See, e. g., Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); McDonough v. Director of Patuxent, 429 F.2d 1189 (4th Cir. 1970).

■ Recent caselaw too supports inquiry into prison administrators' restriction of constitutional rights other than that of liberty itself.

There is no doubt that discipline and administration of state detention facilities are state functions. They are subject to federal authority only where paramount federal constitutional or statutory rights supervene. It is clear, however, that in instances where state regulations applicable to inmates of prison facilities conflict with such rights, the regulations may be invalidated. Johnson v. Avery, *supra*, 393 U.S. 486, 89 S.Ct., 749.

Prior to *Johnson* and since, federal courts have directed state and federal penal officials to honor convicts' claims to religious freedom, freedom of speech and association, and freedom from racial classification. See, e. g., Brown v. Peyton, 437 F.2d 1228 (4th Cir. 1971); Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970); Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). The reasoning supporting such intervention must be that the prison authorities have shown no compelling need to suppress these rights. Plainly stated, they have not shown such remarkable success in achieving any conceivable valid penological end by means which entail the abridgment of these constitutional guarantees as might make their denial seem worthwhile. Cf. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

■ Courts have also intervened when sentences are administered in a manner that seems unintended and unauthorized by the convicting court. Relief is justifiable in some cases on the fairly basic rationale that to extend or augment punishment beyond that imposed by a state court is to penalize without due process. A valid state judgment affords no license to exceed its terms. Perkins v. Peyton, 369 F.2d 590 (4th Cir. 1966).

■ Inquiry into the administration of sentences has also been promoted by the trend elsewhere in law to reject the so-called right-privilege distinction. Although state law may authorize the grant or withdrawal of certain benefits during incarceration, and state authorities may be taken, in sentencing, to contemplate the administration of their judgments in conformity with state law, still the federal Constitution circumscribes governmental power to withhold such benefits arbitrarily or discriminatorily.

Finally, penal authorities have been constrained to refrain from punishment deemed cruel and unusual in situations where some other penalty might legally be imposed. Some courts have, further, held that any penalty at all for an act which could not legally be a violation amounts to cruel and unusual punishment. Carothers v. Follette, *supra*, 314 F.Supp. 1026.

■ Rejection of the right-privilege distinction as a sterile form of words has likewise cast doubt upon the logical difference between deprivations constituting "punishment" and those presented as techniques for the maintenance of "control" or "security." Presumably the consequence of labeling a deprivation a matter of control is that it may be imposed without procedural preliminaries. The distinction is unpersuasive. Substantial deprivations of rights even in matters called civil where no misconduct is alleged have not been permitted without due process. Reasons of security may justify restrictive confinement, but that is not to say that such needs may be determined arbitrarily or without appropriate procedures. In an obvious sense, too, any treatment to which a prisoner is exposed is a form of punishment and subject to eighth amendment standards. This is not to say, though, that prison officials may not treat their charges as individuals. Deprivations of benefits of various sorts may be used so long as they are related to some valid penal objective and substantial deprivations are administered with due process. "Security" or "rehabilitation" are not shibboleths to justify any treatment. Still courts must keep in mind that a recognized valid object of imprisonment is not just to separate and house prisoners but to change them. When it is asserted that certain disabilities must be imposed to these ends, courts may still inquire as to the actuality of a relation between means and end. The test of necessity will, as mentioned above, be more stringent when a deprivation of a fundamental constitutional right is involved. When officials assert lack of funds needed to achieve their goals by means which would not infringe constitutional rights, moreover, the attempted justification will usually fail. Hamilton v. Love, 328 F.Supp. 1182 (E.D.Ark. 1971).

■ Extensive evidence was presented and detailed factfindings have been made for the reason that the plaintiffs contend, and the Court has concluded, that the constitutional violations of which they complain are not isolated deviations from normal practice but rather indicated traditional procedures in the state penal system. When such a showing is made it is the Court's duty not solely to amend so far as possible the defaults of the past but to prevent their likely recurrence in the future.

The Court, at trial, granted counsel a certain amount of leeway in presenting evidence; as a result the record runs at some points far afield into issues not strictly of constitutional scope. For this reason it bears examination not only by lawyers but by any officials of our state government concerned to provide a penal system better, perhaps, than required by minimum constitutional guaranties.

One problem raised and not resolved by a study of the cold record, the credibility of much of the testimony, pervades this case as it has few others in this Court's experience. Witnesses drawn from a society of convicts as a rule may not have so refined a regard for the value of truth as most citizens. All of the unreliable testimony in the case has not, however, come from members of the plaintiff class. Custodial personnel live with their charges in a climate of intimate tension; it would be surprising indeed if an exchange of standards and values did not take place between them. Prison administrators too, perhaps understandably, may develop a self-protective instinct that manifests itself in a tendency to preserve and fall back on the written record of propriety, although it may not reflect reality. These observations must lead this Court, and anyone else concerned

with maintaining fairness in the operation of our penal system, to conclude that the fairest rules must fail to fulfill that goal if they are not administered by fair-minded and intellectually capable men. The work of custodial personnel is such as to frequently try the patience of Job. Nevertheless, the daily administration of rules for conduct of an admittedly different society requires not only firmness but awareness of the purpose of incarceration.

The proof shows three general classes of constitutional deprivation, each a subject for injunctive relief. Discipline has been imposed for the wrong reasons. It has been imposed in cases of what may have been validly punishable misconduct, but without the requisites of procedural due process. And, punishment of a sort that the Constitution bars in any event has been imposed.

■■■ Just as the cruel and unusual punishment clause restrains the judiciary and the legislature, Ralph v. Warden, 438 F.2d 786 (4th Cir. 1970), reh. denied, March 1, 1971, so also it limits the discretion of administrators. The evidence here shows that these limits have been exceeded.

■■■ In gauging the compliance of Virginia officials with this constitutional command, the Court has not found it necessary to explore deeply the question whether a practice in issue constitutes a punishment. Compare Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed. 2d 630 (1958). As noted above, in an obvious sense any term of incarceration, with all of its incidents, constitutes a penalty. The purposes of the eighth amendment might best be served by treating the preliminary issue as thus resolved. Any treatment imposed upon the convict would then be tested by the cruel and unusual standard. See, e. g., Holt v. Sarver, 309 F.Supp. 362 (E.D. Ark.1971), aff'd 442 F.2d 304 (8th Cir. 1971). A deprivation imposed for purposes not of deterring misconduct in the institution but instead for some nonpunitive end, such as disabling a man from injuring himself or property, or for no specific purpose at all, might nonetheless be unconstitutional. A defect in that approach taken alone is that it tends to obscure the issue of disproportion between offense and penalty—a valid eighth amendment inquiry—when a deprivation has concededly been imposed as a consequence of past misconduct within the prison and for the end of deterrence and example. A prisoner is both a participant in society as a whole and a member of the smaller penal community, a relatively closed society subject to a separate set of rules. The cruel and unusual test may validly be applied, in effect, on both levels to intraprison discipline.

Courts have not articulated detailed standards establishing what penalties are cruel and unusual. It is recognized that standards may change. Indeed it is hoped that they will:

> The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. * * * The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society. Trop v. Dulles, *supra*, 356 U.S. 100–101, 78 S.Ct. 598.

The provision, some have suggested, may be violated by the imposition of a penalty that is excessive in comparison with prevailing practice disproportionate with the gravity of the crime, or greater than is necessary to achieve the permissible aims of punishment. Rudolph v. Alabama, 375 U.S. 889, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963) (Goldberg, J., dissenting from denial of certiorari). It is cruel and unusual, furthermore, to impose any punishment whatsoever upon an individual guilty of no harmful act but solely possessed of an incriminating condition. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

A penalty may likewise violate the clause even though it consists only of exposing an individual to a high probability of suffering grievous injury. Cruelty exists for example in imposing on a man the anguish of continued uncertainty as

to his fate, with knowledge that severe consequences may befall him for unforeseeable reasons against which he is powerless to protect himself:

> This punishment is offensive to cardinal principles for which the Constitution stands. It subjects the individual to a fate of ever-increasing fear and distress. He knows not what discriminations may be established against him, what proscriptions may be directed against him, and when and for what cause his existence in his native land may be terminated. * * * It is no answer to suggest that all the disastrous consequences of this fate may not be brought to bear on a stateless person. The threat makes the punishment obnoxious. Trop v. Dulles, *supra*, 356 U.S. 102, 78 S.Ct. 590, 598; See also, Holt v. Sarver, *supra*, 309 F. Supp. at 372–373.

Our own Court of Appeals has stated that lawful incarceration must not include exposure of the prisoner to the risk of arbitrary and capricious action, Landman v. Peyton, 370 F.2d 135, 141 (4th Cir. 1965), cert. denied 388 U.S. 920, 87 S.Ct. 2142, 18 L.Ed.2d 1367 (1967).

Although most of the administrators who testified in this case stated that the imposition of a bread and water diet is now extremely rare, the issue is not moot nor unsuitable for injunctive relief. The director still retains the power to approve bread and water, and in the past he has done so on application by subordinates. Moreover, subordinates have on their own initiative used the practice without approval in the past.

Bread and water provides a daily intake of only 700 calories, whereas sedentary men on the average need 2000 calories or more to maintain continued health. Evidence is not presented on the other nutritional shortcomings of a bread diet, but it does no violence to doctrine of judicial notice to remark that vitamin, protein, and mineral content is probably deficient as well. The purpose and intended effect of such a diet is to discipline a recalcitrant by debilitating him

physically. Without food, his strength and mental alertness begin to decline immediately. It is a telling reminder too that prison authorities enjoy complete control over all sources of pleasure, comfort, and basic needs. Moreover, the pains of hunger constitute a dull, prolonged sort of corporal punishment. That marked physical effects ensue is evident from the numerous instances of substantial weight loss during solitary confinement.

Even the Superintendent of the Virginia State Farm, one of whose foremost concerns, and rightly so, must be the safe confinement of dangerous men, has not found it necessary to use bread and water in his memory. Other officials report a very rare use of the tactic. A current manual on prison practices strongly disapproves any disciplinary diet which impairs health. American Correctional Association, Manual of Correctional Standards (hereinafter A.C.A. Manual), 417 (1966).

The practice is therefore both generally disapproved and obsolescent even within this penal system. It is not seriously defended as essential to security. It amounts therefore to an unnecessary infliction of pain. Furthermore, as a technique designed to break a man's spirit not just by denial of physical comforts but of necessities, to the end that his powers of resistance diminish, the bread and water diet is inconsistent with current minimum standards of respect for human dignity. The Court has no difficulty in determining that it is a violation of the eighth amendment. Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968); Wright v. McMann, 321 F.Supp. 127 (N.D.N.Y.1970).

Likewise, to restrain or control misbehavior by placing an inmate in chains or handcuffs in his cell is unconstitutionally excessive. The evidence showed that in Belvin's case this practice left him with permanent scars, and in his case and that of Johnson it caused lack of sleep and prolonged physical pain. Neither man was released to respond to a call of nature, nor could they

eat. Further details are not necessary in order to reveal that it constituted physical torture.

> Corporal punishment should never be used under any circumstances. This includes such practices as * * * handcuffing to cell doors or posts, shackling so as to enforce cramped position or to cut off circulation, * * deprivation of sufficient light, ventilation, food or exercise to maintain physical and mental health, forcing a prisoner to remain awake until he is mentally exhausted, etc. * * *
>
> * * * *The regulations of well-run* prisons usually provide, in effect, *that force may be used only when necessary to protect one's self or others from injury, or to prevent escape, or serious injury to property.* A.C.A. Manual, *supra*, 417 (italics original).

Corporal punishment of this variety is outmoded and inhuman. The Constitution forbids it, and this Court shall enforce that ban. It is not contended that a man in a locked solitary cell cannot be kept from escaping, injuring others, or destroying things of value. The only justification for the policy is to prevent self-injury. (Ironically, Belvin seems to have been seriously cut by his "protective" chains, either despite or on account of his own efforts). The Court simply cannot conceive that no less drastic means can achieve that legitimate end. The extent of the constitutional guaranty is not fixed by the administrators' budget or imagination. Jackson v. Bishop, *supra*, 404 F.2d 580. Here the evidence shows that Belvin's fetters were put on without medical approval. A doctor, if called on for a recommendation, might well have prescribed some form of drug treatment. Only recently have penitentiary officials sought to borrow some strait jackets for such emergencies. Indeed to a great extent the control of violent inmates has been left in the hands of guard personnel, who call to their superiors' attention incidents such as Belvin's experience only after the fact by brief written reports. Thus efforts to explore alternative treatment methods have not been exhausted; indeed they have hardly been commenced. On this showing the practice of fettering inmates in closed cells is both cruel and unnecessarily so.

■■ The practices of taking inmates' clothing while in solitary and keeping them in unheated cells with open windows in the winter have been disapproved in Wright v. McMann, *supra*. Such penalties, which work to degrade an inmate by denying him any of the sources of human dignity and imperil his health as well, are cruel and unusual. The Court recognizes, as pointed out by the prison authorities, that recalcitrant inmates may well, and undoubtedly do, break windows deliberately—nevertheless this conduct can surely be punished by a method less likely to endanger the health of the inmate. See also, Anderson v. Nosser, 438 F.2d 183 (5th Cir. 1971). The Court will permit an inmate to be kept nude in his cell only when a doctor states in writing that the inmate's health will not thereby be affected and that the inmate presents a substantial risk of injuring himself if given garments.

■ The instances of chaining, denial of clothing, and exposure to cold have, on the evidence, not been everyday occurrences. New regulations in Guideline 800 also purport to outlaw some of these practices. Nevertheless injunctive relief seems appropriate for the reason that in the past punishments of this sort have been inflicted by guards acting alone. Administrators, in other words, have not been in complete control of their subordinates. There is no particular reason to believe that this situation is being remedied. See Landman v. Peyton, *supra*. Only injunctive relief will adequately protect the plaintiff class.

■ On occasion prisoners in solitary confinement have been deprived of their mattresses and blankets as punishment for misconduct. The new guidelines authorize this to be done to punish "destructive behavior." In the past this

has been done for such offenses as noise-making, as in Moon's case. The penalty is undoubtedly harsh, but the Court is not persuaded that it is cruel and unusual. There is no evidence that it had a substantial effect upon anyone's health. If the cell is otherwise clean, and well heated, and the prisoner keeps his clothing, it should not be detrimental. Other cases holding solitary confinement, which included a denial of bedding, cruel and unusual generally included the element of unsanitary conditions. See Wright v. McMann, *supra*, 321 F.Supp. at 139–141; Knuckles v. Prasse, 302 F.Supp. 1036, 1061–1062 (E.D.Pa.1969); Hancock v. Avery, 301 F.Supp. 786, 792 (M.D.Tenn.1969); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Calif. 1966).

█ The practice of crowding several men into a single "solitary" cell, however, must be condemned. Wade Edmond Thompson was held for twenty-four days in a meditation cell at Field Unit No. 7. When first "jailed," he was put in a one-man cell with six or seven others. All had apparently refused to work in cold weather, but there is no evidence that any threatened violence. Thompson was taken briefly to a solitary cell at another camp, but then for some reason he was returned to Unit 7 and kept for a further two weeks in a cell with three other men. Three men slept on two mattresses, and the fourth slept in one corner with his feet stretched over the others. They were also denied the usual Bible to read. Several administrators stated that more than one man should be put into a solitary cell only if emergency conditions required it. In Thompson's case, however, no such justification is shown. Clearly if a number of men had earned a term in meditation, the authorities had the capacity to distribute them among various penal units. The crowding is thus shown unnecessary and takes on a vindictive aspect.

█ Cases involving overcrowding in prison cells have generally included aggravating conditions such as denial of clothing, unhygienic conditions, and other abuses. Anderson v. Nosser, *supra;* Knuckles v. Prasse, *supra*. Here there is no sign that health was in fact jeopardized. *Anderson* and *Knuckles* concerned conditions that prevailed for less than three days. Four men here were penned like animals in a small cell, designed for one, for fourteen days without respite. Lack of space made sleeping very difficult. If confined men retain any claim at all to human dignity, they cannot be needlessly so dealt with for such long periods of time. The system's new guidelines provide that superintendents shall "proceed to alleviate [excess occupancy] as promptly as possible." Again, in view of the system's past difficulties in securing compliance with its regulations at lower levels, the Court shall enjoin extended, unnecessary confinement in solitary cells of more men than the cell was meant to hold.

██ Tear gas has also been used to silence noisy, misbehaving men while confined to their cells. Thomas Jefferson was gassed three times, and others have been gassed in their cells at the penitentiary. The problem of dealing with convicts who persist in disturbing entire cell blocks and inciting others to join in the disorder is a real one. The Court has not found any instances of gassing men in cells who were not currently disruptive. Yet the use of gas to disable a man physically who poses no present physical threat constitutes a form of corporal punishment, the use of which in such a situation is generally disapproved. Undoubtedly it is effective, but it is painful, and its abuse is difficult to forestall. The problem appears to arise because there appears to be no way to isolate a misbehaving inmate to an area where his rantings will not disturb anyone. This difficulty is, however, one of the system's own creation. If chaining a man to his bars, punishing him with a strap, and other corporal punishment should be enjoined, Jackson v. Bishop, *supra*, this Court cannot make a principled distinction which would permit the use of tear gas to punish or control the nonthreatening inmate.

■ There was evidence, furthermore, that some inmates were not permitted to shower during extended stays in solitary. Relief on this score will be denied because there is no proof that at such times they were also denied the necessary sanitary items so that they might wash in their cells.

The Court would not enter upon a review of the procedural aspects of prison discipline were there a lack of evidence in this case that discipline had been imposed upon men guilty of no infraction. Unfortunately, there is credible evidence to the contra. Many of the prisoner witnesses, who testified that they were placed in solitary cells or lost certain privileges, readily admitted that they had disrupted legitimate prison functions. Others, however, just as plainly were penalized for communicating with courts or lawyers in a fashion that might not be punished, for protected litigation activities, for offenses that simply had not occurred, or on the basis of unfounded suspicion. In other cases the reasons men were punished cannot be determined with certainty; had more explicit procedural directions been followed in such cases there might well be no question now. These factors distinguish this case from Sostre v. McGinnis, *supra,* where the evidence did not disclose a pattern of due process violations, and from such cases as Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970), and Courtney v. Bishop, 409 F.2d 1185 (8th Cir. 1969), where procedural faults did not work to deny any fundamental rights.

Still, matter for preliminary inquiry is whether this Court ought to consider any claim of unlawful denial of good time credit prior to the exhaustion of state court remedies. The general rule is that the 1871 Civil Rights Act, 42 U.S.C. § 1983, will not serve as a substitute for the federal habeas corpus remedy, such that one might avoid the exhaustion requirement by invoking the former. Rodriguez v. McGinnis, 451 F. 2d 730 (2d Cir. 1971). So stated, the rule begs the question: When must a claim be presented in habeas?

Recent caselaw has expanded the scope of federal habeas corpus, so that the writ is available to achieve relief other than immediate release. See, *e. g.,* Peyton v. Rowe, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968). In consequence it has been said that "[i]nsofar as one attacks only the state computation of sentence-service, and not the validity of the entire sentence, habeas corpus is still the proper remedy in those exceptional cases where the state's computation of service of a sentence presents a federal question." Schiro v. Peyton, No. 13,086, mem. decis. (4th Cir. 1968).

■ In a sense, of course, any claim of violation of a prisoner's constitutional rights amounts to an allegation that he is "in custody in violation of the Constitution * * *," 28 U.S.C. § 2254(a). Still it has long been clear that many such claims, whether or not they might have been raised in a habeas case, see Developments in the Law— Federal Habeas Corpus, 83 Harvard L. Rev. 1038, 1079–87 (1970), are nonetheless properly presented in a civil suit in equity.[1] Prevailing precedent in this Circuit permits claims that good behavior time has been arbitrarily denied, and that injunctive relief is therefore owing, to be litigated in § 1983 actions,

---

1. See, *e. g.,* McDonough v. Director of Patuxent, 429 F.2d 1189 (4th Cir. 1970) ; Blanks v. Cunningham, 409 F.2d 220 (4th Cir. 1969) ; Jackson v. Godwin, 400 F. 2d 529 (5th Cir. 1968) ; Abernathy v. Cunningham, 393 F.2d 775 (4th Cir. 1968) ; Arey v. Peyton, 378 F.2d 930 (4th Cir. 1967) ; Landman v. Peyton, 370 F.2d 135 (4th Cir. 1966) ; Howard v. Smyth, 365 F.2d 428 (4th Cir. 1966) ; Coleman v. Peyton, 362 F.2d 905 (4th Cir.), cert. de-

nied, 385 U.S. 905, 87 S.Ct. 216, 17 L.Ed. 2d 135 (1966) ; Rivers v. Royster, 360 F.2d 592 (4th Cir. 1966) ; Edwards v. Duncan, 355 F.2d 993 (4th Cir. 1966) ; Hirons v. Director, Patuxent Inst., 351 F. 2d 613 (4th Cir. 1965) ; Childs v. Pegelow, 321 F.2d 487 (4th Cir. 1963), cert. denied 376 U.S. 932, 84 S.Ct. 702, 11 L. Ed.2d 652 (1964) ; Roberts v. Pegelow, 313 F.2d 548 (4th Cir. 1963) ; Sewell v. Pegelow, 291 F.2d 196 (4th Cir. 1961).

and indeed disapproves the use of habeas corpus. Roberts v. Pegelow, 313 F.2d 548 (4th Cir. 1963). If the scope of habeas has since expanded, see Johnson v. Avery, *supra;* Peyton v. Rowe, *supra,* there is nonetheless no reason to assume that the ambit of § 1983 has thereby *pro tanto* contracted. Other circuits as well have dealt with "good time" claims under the Civil Rights Act. United States ex rel. Campbell v. Pate, 401 F.2d 55 (7th Cir. 1968); Douglas v. Sigler, 386 F.2d 684 (8th Cir. 1967). The rule of Rodriguez v. McGinnis, *supra,* does not prevail in this Circuit.

■■■ Whether certain procedural prerequisites are required before intraprison discipline is imposed is governed by conventional due process standards, adapted as may be necessary to the prison environment. The argument that the right to be free of the substantial restraints of solitary confinement, "padlock," or maximum security segregation or to earn statutory "good time" are matters of mere legislative or administrative grace fails in the face of current constitutional doctrine.

The constitutional challenge cannot be answered by an argument that public assistance benefits are "a 'privilege' and not a 'right.'" Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Relevant constitutional restraints apply as much to the withdrawal of public assistance benefits as to disqualification for unemployment compensation, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); or to denial of a tax exemption, Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); or to discharge from public employment, Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956). The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be "condemned to suffer grievous loss," Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951)

(Frankfurter, J., concurring) and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. Accordingly, as we said in Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the governmental function involved as well as of the private interest that has been affected by governmental action." See also, Hannah v. Larche, 363 U.S. 420, 440, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). Goldberg v. Kelly, 397 U.S. 254, 262–263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); see also, Caulder v. Durham Housing Authority, 433 F.2d 998 (4th Cir. 1970).

Our Court of Appeals has given effect to this principle in a closely related area, that of parole revocation. Bearden v. South Carolina, 443 F.2d 1090 (4th Cir. 1971). The court there required, at a minimum, notice of allegations said to amount to noncompliance with parole conditions, and an opportunity for a hearing at which one might present witnesses. The Fourth Circuit has also expressed concern over the lack of certain due process elements in the Penitentiary, which lack may bring about the arbitrariness that the due process clause forbids. In Landman v. Peyton, *supra,* the court took note that the entrusting of disciplinary matters to guards, so that contact between prisoners and administrators is seldom made, invites capricious and partial decision making. *Id.,* 370 F.2d 141.

In dictum, the Second Circuit has recognized the requirement of procedural fairness:

We would not lightly condone the absence of such basic safeguards against arbitrariness as adequate notice, an opportunity for the prisoner to reply to charges lodged against him, and a reasonable investigation into the

relevant facts—at least in cases of substantial discipline. Sostre v. McGinnis, *supra.*

That case has been followed in this Circuit in Bundy v. Cannon, 328 F.Supp. 165 (D.Md., 1971), where the court required procedural safeguards prior to withholding of good time credit, transfer to maximum security, and solitary confinement.

Similar possible penalties were found sufficiently grievous in Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal., 1971), to require notice, hearing before an impartial tribunal, confrontation, the presentation of witnesses, counsel or a substitute, and written factfindings. See also, Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970); Meola v. Fitzpatrick, 322 F.Supp. 878, 8 Cr.L.Rptr. 2404 (D. Mass.1971); Carothers v. Follette, *supra;* Kritsky v. McGinnis, 313 F.Supp. 1247 (N.D.N.Y.1970); Morris v. Travisono, 310 F.Supp. 857 (D.R.I.1970).

As directed in *Cafeteria Workers, supra,* the Court must identify and analyze the precise nature of the individual interest at stake and compare it with the purpose and function of the governmental body. See also, Hannah v. Larche, *supra,* 363 U.S. 440–453, 80 S.Ct. 1502. The disciplinary function fulfilled in the decision to place a man in solitary confinement, to deny good time credit, to "padlock" him in his cell involuntarily, or to impose the substantial disabilities of maximum security confinement, adjudicates the question of a substantial deprivation or grievous injury. Whether cast in terms of a finding of unfitness to circulate in the general population or seen as a determination of guilt, the decision to place a man under greater than usual restraint is founded upon a finding of noncompliance with general prison standards. Cf. Goldberg v. Kelly, *supra.* The effort to depict "C" cell and the like as a rehabilitative facility, usable at the penal authority's discretion, is unsuccessful. See Howard v. Smyth, *supra.*

The individual interest at stake is obvious—the avoidance of severe punishment. The privileges at stake are substantial. A man in solitary confinement is denied all human intercourse and any means of diversion. Padlock confinement isolates the individual as well from his fellows. Maximum security confinement is a lesser penalty, but like the others it interrupts a prisoner's efforts at rehabilitation and curtails many recreational activities. Loss of good time credit may in effect amount to an additional prison sentence. On the other hand, the effect on a man in prison of a further sixty day term may be less than the effect of a sixty day jail term on a free man. The prisoner, one assumes, has already suffered loss of his job and damage to his reputation, and his family ceased to rely upon him, when he was convicted, whereas the free man may find these interests imperiled by even a short sentence. The losses which ensue from a prison disciplinary action may not be as lasting as the employment opportunities at stake in Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) and Willner v. Committee On Character and Fitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963). At the same time deprivation may be momentarily as telling as the loss of financial support or housing which were treated in *Goldberg* and *Caulder.*

A proper consideration is the effect that the introduction of procedural safeguards may have on legitimate prison functions both within and without the ambit of discipline. The security of a population confined against its will in close quarters is a prime concern. Moreover, administrators must have a certain leeway in allocating scarce resources available for rehabilitative purposes. The speed with which misbehavior is punished may rightly be considered essential to its effectiveness. Administrators with many nondisciplinary duties must not be sidetracked from their tasks. Minor on-the-spot exactions for minor offenses may well be deemed necessary to keep order effectively; it is not only major regulations, after all, that must be enforced.

■ However, to say that individual rights may be sacrificed to custodial or rehabilitative necessity is not to state that courts will not inquire as to the need for such sacrifices and the reality of the claimed benefits. In re Gault, *supra*, 387 U.S. 17–31, 87 S.Ct. 1428.

■ In these adjudicatory proceedings the Court concludes that certain due process rights are both necessary and will not unduly impede legitimate prison functions.

First, the decision to punish must be made by an impartial tribunal. This bars any official who reported a violation from ruling. Goldberg v. Kelly, *supra*, 397 U.S. 271, 90 S.Ct. 1011; Escalera v. New York City Housing Authority, 425 F.2d 853, 863 (2d Cir. 1970). A substantial question arises whether field unit officials can ever so divorce themselves from events in their small units sufficiently to sit impartially. The Court has not been shown that this is impossible, but in any individual case participation in occurrences giving rise to a charge shall bar any man from sitting in judgment. There appears to be no reason to require that the disciplinary board be composed of any specific number of individuals. Each member of a panel must, however, be free of prior involvement with the incident under examination so that he may settle the case on the basis of the evidence at the hearing.

Second, there shall be a hearing. Disposition of charges on the basis of written reports is insufficient. Prisoners are not as a class highly educated men, nor is assistance readily available. If they are forced to present their evidence in writing, moreover, they will be in many cases unable to anticipate the evidence adduced against them. Particularly where credibility and veracity are at issue * * * written submissions are a wholly unsatisfactory basis for decision." Goldberg v. Kelly, *supra*, 397 U.S. 269, 90 S.Ct. 1021. Necessarily a hearing encompasses the right to present evidence in defense, including the testimony of voluntary witnesses.

A hearing must be preceded by notice in writing of the substance of the factual charge of misconduct. Only with written notice can a prisoner prepare to meet claims and insist that the hearing be kept within bounds. In re Gault, *supra*, 387 U.S. 33, 87 S.Ct. 1428. A reasonable interval to prepare a defense must be allowed as well, but the Court declines to fix any definite period. Rather whether a trial has been too speedy must be determined on a case-by-case basis.

Cross-examination of adverse witnesses likewise is necessary. The Court appreciates the concern of prison officials that interrogation by prisoner of the guard force may be at variance with their ordinary respective positions in the penal hierarchy. Because most disciplinary cases will turn on issues of fact, however, the right to confront and cross-examine witnesses is essential. Escalera v. New York City Housing Authority, *supra*, 425 F.2d 862. It is, however, well within the power of the disciplinary official or tribunal to restrict questioning to relevant matters, to preserve decorum, and to limit repetition.

Fundamental to due process is that the ultimate decision be based upon evidence presented at the hearing, which the prisoner has the opportunity to refute. Goldberg v. Kelly, *supra*, 397 U.S. 271, 90 S.Ct. 1011; Escalera v. New York City Housing Authority, *supra*, 425 F.2d 862–863. "To demonstrate compliance with this elementary requirement, the decision maker should state the reasons for his determination and indicate the evidence he relied on," Goldberg v. Kelly, *supra*, 397 U.S. 271, 90 S.Ct. 1022. To permit punishment to be imposed for reasons not presented and aired would invite arbitrariness and nullify the right to notice and hearing.

■ The Court will not require an appellate procedure. However, if higher authorities than the disciplinary committee feel duty bound to re-examine decisions, their review must be restricted to the charge made and the evidence presented. The practice of going outside the record in search of bases for punish-

ment must cease. "It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made." Cole v. Arkansas, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644 (1948).

In addition, for the reason that the evidence shows that some inmates are unfortunately intellectually unable to represent themselves in discipline hearings, the tribunal should permit a prisoner to select a lay adviser to present his case. This may be either a member of the noncustodial staff or another inmate, serving on a voluntary basis. See Bundy v. Cannon, *supra*. Notice of charges shall include the information that such assistance is available.

■ In other instances where proceedings may result in the loss of substantial rights, the right to representation by counsel has been considered an essential element of due process. "Counsel can help delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the interests of the recipient." Goldberg v. Kelly, *supra*, 397 U.S. 270, 90 S.Ct. 1022; see Caulder v. Durham Housing Authority, *supra*, 433 F.2d 1004. Following Bearden v. South Carolina, 443 F.2d 1090 (4th Cir. 1971), it seems that there is no requirement that the state provide legal aid. However, where substantial sanctions are possible and the assistance of counsel may be of benefit, retained counsel is necessary to protect the factfinding and adjudication process unless there is shown some "compelling governmental interest in summary adjudication," Caulder v. Durham Housing Authority, *supra*, 433 F.2d 1004 n. 3, the fulfillment of which is inconsistent with the right to retained counsel. Cf. Brown v. Peyton, *supra*, 437 F.2d 1231. The state has not endeavored to do so, other than by testimony that the presence of counsel might turn the hearing into a "hassle." The Court does not accept this speculation as well-founded. Experience with *pro se* trial litigants indicates that the contrary

is more likely true. On the other hand, the Court has observed that prison officials legitimately desire to conduct disciplinary proceedings speedily. Therefore a prisoner who desires to secure counsel for hearing may be required to notify the committee of that fact, and postponement of the hearing to secure counsel may reasonably be limited to four days.

These minimum due process standards are necessary when solitary confinement, transfer to maximum security confinement, or loss of good time are imposed, or a prisoner is held in padlock confinement more than ten days.

The imposition of the minor fines disclosed by the evidence, for example, or, hypothetically, loss of commissary rights, restriction of individual recreational privileges, or padlocking for less than ten days, do not require this panoply of guaranties. The right to be represented by another may be omitted. Written notice may be dispensed with, and appellate review need not be formally conducted. The Court will only require verbal notice and the opportunity for a hearing before an impartial decision maker, with a chance to cross-examine the complaining officer and to present testimony in defense. As always, however, procedural formality may not shield arbitrary action. Impartiality and a chance to air the facts may be expected to prevent arbitrary action as well as the good faith factual errors which the Court has observed in the record.

Few of the opinions to date on prison discipline treat in depth the real problem of vagueness in institutional regulations. The evidence, however, shows that the purposes of the constitutional requirement of reasonable specificity—fair warning so that one may conform to the rules, and exactness so that arbitrary penalties or penalties for protected conduct will not be imposed—have been ill-served by the rules enforced against Virginia prisoners. Particularly in a situation where the safeguard of public trial is absent, cf. McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29

L.Ed.2d 647 (1971) (Brennan, J., concurring and dissenting), and necessarily so, other procedural safeguards against arbitrariness should not be slighted. Morris v. Travisono, *supra*, 310 F.Supp. 861, notes the seriousness of the problem, but does not resolve it. Talley v. Stephens, 247 F.Supp. 683 (E.D.Ark. 1965), required in cases of corporal punishment that recognizable standards of conduct be set. Likewise it is settled that imprisonment does not remove a prisoner's right to be free from arbitrary sanctions. Landman v. Peyton, *supra.* The Constitution requires even of minor criminal laws that they give in advance fair notice of forbidden acts. Palmer v. City of Euclid, 402 U.S. 544, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971); Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). Virginia prisoners have been penalized for such ill-defined offenses as "misbehavior" and "agitation." Recent amendments to discipline procedure have not sharpened the outlines of these offenses. On the other hand, existing regulations governing maximum security facilities, which are in the record, demonstrate that the prison authorities are capable of phrasing their requirements with reasonable specificity. The Court does not imply approval of all of those rules; they show, however, that the authorities themselves believe in the practical value and feasibility of rules. See also the disciplinary code reproduced in Bundy v. Cannon, *supra.*

To recanvass the full range of justifications for the vagueness doctrine would unduly prolong this opinion. For useful commentary, see McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) (Brennan, J., dissenting); Soglin v. Kauffman, 418 F.2d 163 (7th Cir. 1969). In the prison context these considerations argue for application of the requirement:

1. At least in Virginia, where discipline has been used to suppress litigation efforts, the need exists to establish in advance, to avoid a chilling effect, the limits of administrators' power.

2. Like other elements of due process, prior notice of standards of behavior enhances the prisoner's sense of fair treatment and contributes to rehabilitation. See In re Gault, *supra.*

3. Equal treatment of similar conduct —at least to the extent of recording offenses, if not in penalties—will be more certain with fixed rules.

4. The ingredient, in vagueness law, of something like a doctrine forbidding delegation of legislative powers is essential in prison, where the risk of arbitrary action by lower officials is great.

5. The need for judicial review of prison disciplinary actions may greatly decrease in the future if violations of existing rules can be shown.

6. Prison life is highly routine; it therefore ought not to be difficult to establish in advance reasonably clear rules as to expected behavior. Automatic compliance may be expected of many.

7. Specificity has been required in the academic sphere, where administrators likewise are not specialists in legislation.

8. Severe sanctions may result in prison; the greater the individual loss, the higher the requirements of due process.

Countervailing considerations deserve mention:

1. Life is complex in prison as well as outside, and all forms of misbehavior cannot be anticipated. Some may go unpunished for want of a rule.

2. Administrators ought not to be put to the choice of foregoing discipline in such cases or resorting to the ordinary criminal process, for flexibility may work to the benefit of the institution and the inmates as well.

3. Legalistic wrangling over whether a rule was broken may visibly undermine the administration's position of total authority, necessary for security's sake.

4. Prisoners, unlike free men, must well know that they are considered potentially dangerous men and must expect to be highly regimented. In such cases the law requires less in the way of

notice, and places a greater burden on the individual to make inquiry or ask permission before acting. Cf. United States v. International Minerals & Chemical Corp., 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971).

■■■ The objections to the application of some vagueness principle may all be met simply by relaxing the standard somewhat in deference to the state's legitimate needs, rather than by abandoning it. The Court concludes, therefore, that the existence of some reasonably definite rule is a prerequisite to prison discipline of any substantial sort. Regulations must in addition be distributed, posted, or otherwise made available in writing to inmates. Discussion here will be confined to those bases for punishment disclosed in the evidence.

■■■ "Misbehavior" or "misconduct," for which, for example, Jefferson and Scott were penalized, offers no reasonable guidance to an inmate, Giaccio v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966), whereas it leaves the administrator irresponsible to any standard. Penalties may not be imposed on this ground.

■■■ "Agitation" appears to encompass discussing litigation with other prisoners, assisting them in litigation, or advising them as to the law. It also includes, as is apparent from Thompson's case, complaining to the authorities, and according to Cunningham, it may include the giving of incorrect legal advice. Prison authorities may legitimately fear the incitement of rule violations and the interruption of orderly activities, and may punish men who engage in such conduct. However, the ban on "agitation" at once gives no fair warning that certain conduct is punishable and, in practice, includes the rendition of legal advice and the preparation of legal pleadings, protected activities.

■■■ On the other hand, the Court is not persuaded that the offenses of "insolence," "harassment," and "insubordination," directed against custodial or administrative personnel, are unduly vague. This is not to say, however, that in a given case the imposition of sanctions on such grounds may not be found arbitrary if not based on evidence.

■■■ The evidence has shown as well certain instances of the imposition of penalties for constitutionally protected activities. The law by now should be clear that whereas prison officials may reasonably regulate the preparation of legal pleadings in service of valid state interests, they may not prohibit or punish inmates for conducting litigation of their own or for rendering assistance to other inmates, in the absence of any other adequate source of legal aid. Johnson v. Avery, *supra;* Ex parte Hull, *supra;* Nolan v. Scafati, *supra;* Gittlemacker v. Prasse, 428 F.2d 1 (3d Cir. 1970); Blanks v. Cunningham, *supra;* Landman v. Peyton, *supra;* Coleman v. Peyton, *supra;* Edwards v. Duncan, *supra;* Meola v. Fitzpatrick, *supra.* These rights have been construed to extend to prisoners desiring to sue under the Civil Rights Act, Nolan v. Scafati, *supra;* Blanks v. Cunningham, *supra.* There is also a corollary right to communicate for the purposes of enlisting an attorney's aid. McDonald v. Director, *supra.* The evidence as to procedural irregularities makes it unnecessary to analyze in depth how these rights have been abridged in disciplinary proceedings according to the evidence. Nevertheless express findings of fact have been made as to each instance in which such abuses were disclosed, for the sake of a complete record.

The exercise of the right to contest confinement or punishment has also been restricted by less sophisticated means. Landman and Hood were transferred to the Penitentiary from lower security institutions. Arey was kept in maximum security for many months, and some of his letters to attorneys simply were not mailed. Hood's correspondence with counsel was intercepted and copied. Landman and Johnson were explicitly told to refrain from filing complaints or, in Landman's case, doing so for others. Landman's papers too have been taken

or destroyed. Mason was kept in "C" cell as retribution for his successful desegregation suit.

In addition, for many years persons held in meditation could not file suits or write to counsel. Counsel have suggested that recently this prohibition has been lifted. In view of the difficulty, which the Court has mentioned before, which administrators have experienced in securing compliance with regulations by subordinates, and the tardiness of changes in regulations, injunctive relief is nonetheless due. Lankford v. Gelston, 364 F.2d 197, 203 (4th Cir. 1966); Rakes v. Coleman, 318 F.Supp. 181 (E.D.Va. 1970).

 Arey's attempts to communicate with a state legislator likewise deserves relief, on the evidence. The Court can conceive no interest that the State's executive arm might have in keeping whatever information penitentiary inmates may have out of the hands of lawmakers. Compare New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). No witness has suggested one. Interruption of mail to public officials infringes upon the first amendment rights of prisoners and likewise the right of legislators to be informed. Palmigiano v. Travisono, 317 F.Supp. 776, 786 (D.R.I.1970). An injunction shall issue as to this practice.

 Appropriate relief for the class shall look both to past and to future violations. Damages are not at issue in this instant proceeding. The Court shall direct that all good time lost as a result of hearings conducted without compliance with the standards set forth herein be restored, with leave to retry those punished within a reasonable time. Those confined in padlocked or solitary cells likewise shall be released, subject to retrial. Men reasonably thought dangerous may be detained apart from the general population pending their hearings. Inmates in "C" cell and other maximum security units shall be afforded hearings

on the derelictions which gave rise to their incarceration within thirty days or shall be released to the general population. Injunctive relief shall likewise be granted as to those practices deemed cruel and unusual or violative of other constitutional rights.

 Rehabilitative treatment, to repeat, constitutes no talismanic state interest which will justify any exactions from individual prisoners. In this case the state officials have candidly not attempted to make it so; the word rarely was spoken in the course of the trial. Partly because they failed to assert the necessity for current disciplinary procedures for the sake of rehabilitation, the Court has presumed to intrude as it has into the workings of the system.

For the time may come in the future when substantial reasons for depriving men of various liberties, to the end that their behavior may be amended, may be presented. "Prison authorities have a legitimate interest in the rehabilitation of prisoners, and may legitimately restrict freedoms in order to further this interest, where a coherent, consistently-applied program of rehabilitation exists." Brown v. Peyton, *supra*, 437 F.2d 1231. At such time the best justification for the hands-off doctrine will appear. While courts by definition are expert in the field of quasi-criminal procedures, their knowledge of the administration of programs that educate and change men may rightly be questioned. Likewise, it may be imagined that judicial intervention or formal administrative procedures might be positively harmful to some rehabilitative efforts.

This is not to say, of course, that courts should then abandon the individual. However, where the state supports its interest in certain practices by demonstrating a substantial hope of success, deference may be owing, and courts may tend to find certain rights, now protected by conventional procedures, implicitly limited while a man is incarcerated.