IN RE LAMB ET AL.

(No. 31984—Decided February 22, 1973.)

*Mr. Glenn Billington, Mr. Robert Karl Handelman,* and *Mr. Edward R. Stege, Jr.,* for petitioners.

*Mr. Herbert Whiting,* director of law, *Mr. Malcolm C. Douglas,* and *Mr. Nicholas DeVito,* for respondent city of Cleveland.

MANOS, C. J. This case arises upon an original petition for writ of habeas corpus in this Court claiming that petitioners, four inmates at the Cleveland House of Correction

(Warrensville Workhouse), a prison facility operated by the City of Cleveland, have been illegally detained in its punitive segregation facility.

Petitioners were originally jailed to await their trials on criminal charges in the Common Pleas Court of Cuyahoga County. On February 11, 1972, they escaped from confinement. They were subsequently recaptured and indicted for the escape in violation of R. C. 2901.11. On May 4, 1972, they pled guilty to the charge and each was sentenced to six months in the Cleveland House of Correction. On May 11, 1972, they were transported to the prison facility to commence serving their sentences. They remained in isolation for medical examination and testing until May 14, 1972, when a prison officer advised them that they were to be placed in segregated detention in the "New Deal," a punitive segregation facility, as punishment for escaping. Their requests for a hearing, or conferences with other prison personnel, were denied; they were placed in the "New Deal" and remained there from May 14, 1972, until May 26, 1972.

A second disciplinary action raised by the habeas corpus application here in issue involved only petitioner Johnson. On June 3, 1972, he was called to the office of a prison officer approximately one hour after he had observed an assault upon an inmate by a prison guard. After an exchange of words with the prison officer, Johnson was confined to the "New Deal" facility from June 3, 1972, to June 14, 1972, without notice of the charges against him or hearing of any kind.

It is undisputed that such punitive detention resulted in loss of "good time" credit for each of the petitioners. As a consequence, they were all required to serve their *entire* six-month sentences; had they not been punished, each would have been entitled to an automatic diminution of his sentence by one month, and would thereby have been released after but five months of incarceration.

The evidence established that the punitive detention facility is an eight by twelve foot concrete cell with a dirty sink and toilet connected together; no bed or other furni-

ture and no lighting. The petitioners testified that it was situated above a laundry and became excessively hot during the day, that they were denied soap, toothbrushes, toothpaste or towels, that the toilets twice backed up, flooding the cell with unsanitary water, and bugs came into the cell at night.

This application for writ of habeas corpus now before us thrusts this court squarely into consideration of some of the constitutional implications of the complex and delicate business of prison administration. We do not shrink from this assignment. For we believe the subject to be timely presented, appropriately lodged in this jurisdiction, and properly raised by the Great Writ.

Its timeliness is obvious. Although there was a period when a prisoner was "a slave of the state," *Ruffin* v. *Commonwealth* (1871), 62 Va. (21 Grattan) 790, 796, that time is, mercifully, at an end. No longer may courts continue, along with the vast bulk of our citizenry, to wash their hands of the plight of those who populate our penal institutions.

For courts now recognize that in a society which calls itself civilized, prisoners do not abandon all their constitutional rights when the prison doors clang shut behind them. Without denying that " [l]awful incarceration necessarily operates to deprive a prisoner of certain rights and privileges he would otherwise enjoy in a free society, a retraction justified by considerations underlying our penal system", *Price* v. *Johnson* (1948), 334 U. S. 266, 285, it is clear that a convict does not lose *all* his constitutional rights once he enters the prison population; constitutional rights of a fundamental nature, adapted to the context and penologic purposes of the imprisonment, are still available to him. *Coffin* v. *Reichard* (6th Cir. 1944), 143 F. 2d 443, 445, *cert. den.* 325 U. S. 887 (1945). Freedom from discriminatory punishment because of his religious or secular beliefs, *Cooper* v. *Pate* (1964), 378 U. S. 546, discriminatory treatment on the basis of his skin color, *Lee* v. *Washington* (1968), 390 U. S. 333, and denial of access to the courts and the mails to enforce these rights, *Johnson* v. *Avery* (1969),

393 U. S. 483, have not been stripped from him because of his status as a prisoner.

Nor can we deny that he retains some procedural rights before disciplinary punishment. See *Sands* v. *Wainwright*, D. C. M. D. Fla., Jan. 5, 1973, No. 71-339-Civ-J-S; *Gray* v. *Creamer* (3rd Cir. 1972), 465 F. 2d 179, 185; *Sostre* v. *McGinnis* (2nd Cir. 1971), 442 F. 2d 178, 196; *Landman* v. *Royster* (E. D. Va. 1971), 333 F. Supp. 621, 644-45; *Carothers* v. *Follette* (S. D. N. Y. 1970), 314 F. Supp. 1014, 1027.

The extension of fundamental fairness to prison inmates is not in any way inconsistent with appropriate penologic considerations; indeed, it may well be that the grant of basic constitutional rights to prisoners will enhance, rather than impede, legitimate penologic ends.

Whatever may have been the attitudes of the administrators of our penal system in the past, it is now clear that "[r]etribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence." *Williams* v. *New York* (1949), 337 U. S. 241, 248.

That a prisoner is more likely to be rehabilitated in a humane environment where the jailer sets an example of civilized behavior to the inmate than under conditions which further alienate and embitter him against the society that put him there is eminently sensible. For "[a] person who receives what he considers unfair treatment from correctional authorities is likely to become a difficult subject for reformation". *The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections*, 83 (1967); and see *Jackson* v. *Godwin* (5th Cir. 1968), 400 F. 2d 529, 535.

Students of penal conditions and correctional officials themselves have suggested that prison life which most closely approximates living conditions in outside society is most likely to rehabilitate the imprisoned. See, *e. g.*, *American Correctional Association, A Manual of Correctional Standards*, 347 (1954):

"Discipline with the immediate aim of good conduct . . . must look beyond the limits of the inmate's term of

confinement. It must seek to insure carry-over value by inculcating standards which the inmate will maintain after release. The ultimate aim of discipline is individual self-reliance, self-control, self-respect and self-discipline; *it is not merely the person's ability to conform to institutional rules and regulations but his ability and desire to conform to accepted standards for individual and community life in free society"* (emphasis supplied).

And see the conclusion reached by the President's Commission on Law Enforcement and Administration of Justice, that

". . . a first principle of any correctional institution is that staff control can be greatest, and certainly inmate life will be most relevant to that in the free community, if rules regulating behavior are as close as possible to those which could be essential for law and order in any free community, together with such minimal additional rules as are essential to meet the conditions peculiar to the institution." *Id.* at p. 50.

While the argument that just and fair treatment of prisoners will increase the speed and frequency of their rehabilitation into useful citizens is apparently supported in logic and experience, we do not, and need not, undertake to guarantee such a result. It is not necessary in order to consider petitioners' claim of constitutional right, for our obligation to deal with these questions emanates not from an attempt to supervise the administrative process of prisoner rehabilitation, but rather from our self-image as a civilized community and from the command of the Constitution itself. We raise the point only to suggest that, in our view, no adverse penologic side-effects will flow, and perhaps some rehabilitative good may come, from the performance of our constitutional duty.

It is not surprising that the federal courts have begun to give serious attention to the delineation of prisoners' rights in both federal and state penal institutions. What is astonishing is the failure of the state courts to come to grips with these problems in their own custodial institutions. The courts which have been responsible for

placing men behind bars under our system of criminal justice cannot evade their continuing responsibility to protect their basic rights *after* conviction, any more than the Constitution permits them to do *before* conviction.

Moreover, primary responsibility for the delineation of prisoners' rights in state and local custodial institutions ought properly to fall upon the state judiciary system. Without denying federal jurisdiction to review claims of denial of state prisoners' federal constitutional rights under Section 1983, Title 42, U. S. Code, it is both eminently sensible and infinitely less strain upon the delicate balance of federal-state relations in the administration of our federal system of criminal justice to posit such primary responsibility on the state judiciary. Rather than viewing the state judicial system as a delaying but necessary obstacle to be overcome in the exhaustion of state remedies before the real consideration of federal constitutional questions is undertaken in the federal courts, see *Fay* v. *Noia* (1963), 372 U. S. 391, 439, it is especially important that both prisoners and prison administrators recognize that the conflict between prison disciplinary action and prisoners' constitutional rights will receive careful scrutiny in the first instance at the state, as well as the federal level.

To that end, this court regards this case to be not only a case of first impression in Ohio but also a bellwether for state court review of state and local prison disciplinary action.

That state habeas corpus is an appropriate procedural vehicle for this consideration can scarcely be denied. Since the origin of the Great Writ in the 17th Century in the English common law[1], its function has been to test the legality of the restraint of the applicant's liberty. Although in Ohio the writ is statutory (R. C. Chapter 2725), its purpose and function are not dissimilar. In the present controversy, the question raised by the prisoners' application is whether their incarceration in the punitive segregation

---

[1]For a general view of habeas corpus origins, see Oaks, *Habeas Corpus in the State—1776-1865*, 32 U. Chi. L. Rev. 243, 245 (1965),

facility, and their resultant loss of "good time" requiring them to remain in custody an extra month in the general prison population, was illegal because of the denial to them of constitutional rights of procedure and substance. While it is true that in recent years habeas corpus has been used principally to pursue post-conviction relief, there can be little argument that the issues raised here fall squarely within the classic function of the Writ.

We turn to consideration of the substantive questions placed in issue by the Writ.

The questions presented here, may be divided into three parts:

1. May prisoners be confined in the segregated punitive detention facility in a penal institution in the absence of a meaningful evidentiary hearing to determine whether such incarceration is appropriate, without violating the requirements of due process of law?

2. Where prisoners are indicted, found guilty, sentenced and serving a prison sentence for the crime of escape from prison prohibited by R. C. 2901.11, may prison authorities, during that period of incarceration, subsequently punish them for the same offense by further confinement in the segregated punitive detention facility of the prison, without violating the double jeopardy provisions of the Ohio and federal Constitutions?

3. May prisoners be confined in the segregated punitive detention facility in a penal institution under the conditions found here, without violating the cruel and unusual punishment provisions of the eighth amendment, as applied to the States through the fourteenth?

These questions will be considered in sequence below. The views that we have taken regarding the first two questions make it unnecessary for us to reach the third.

### I.

It is apparent that in each instance of punitive segregation involved in this case, petitioners were confined in the segregated punitive detention facility, lost a number of the privileges of the general prison population while so isolated, and lost "good time" sufficient to keep them incar-

cerated an extra month in prison, without any kind of prior hearing to determine the justification, if any, for the imposition of such punishment.

We must, therefore, determine whether these prisoners were entitled to any form of procedural due process prior to their incarceration in punitive solitary confinement, and if so, the extent to which such procedures were required in the special context of the prison milieu.

It is apparent that some form of due process is required before punitive solitary confinement may be imposed upon an inmate in a penal institution. If the withdrawal of welfare benefits, *Goldberg* v. *Kelly* (1970), 397 U. S. 254; garnishment of wages, *Sniadach* v. *Family Finance Corp.* (1969), 395 U. S. 337; suspension of driver's licenses, *Bell* v. *Burson* (1971), 402 U. S. 535; imposition of minimal fines for traffic offenses, *Ward* v. *Monroeville* (1972), — U. S. —, 34 L. Ed. 2d 267; loss of liquor purchasing privileges, *Wisconsin* v. *Constantineau* (1971), 400 U. S. 433; and, more pointedly, revocation of parole, *Morrisey* v. *Brewer* (1972), 408 U. S. 471, 40 U. S. L. W. 5016, June 29, 1972, are sufficient deprivations of liberty or property to require some form of due process before government can take them, it will scarcely do to relegate punitive solitary confinement to some inferior constitutional status. Accordingly, we hold that prisoners are entitled to some degree of procedural due process in advance of deprivation of their liberty in punitive solitary confinement. Many courts have so held. *E.g., Sostre* v. *McGinnis* (2nd Cir. 1971), 442 F. 2d 178; *Jackson* v. *Bishop* (8th Cir. 1968), 404 F. 2d 571; *Jackson* v. *Godwin* (5th Cir. 1968), 400 F. 2d 529; *Krause* v. *Schmidt* (W. D. Wis. 1972), 341 F. Supp. 1001; *Clayton* v. *Jones* (5th Cir. 1972), 463 F. 2d 1182.

The more difficult question is: what procedural process is "due"? We recognize that we must apply a flexible standard, that due process embodies "differing rules of fair play . . . [in] differing types of proceedings", *Hannah* v. *Larche* (1960), 363 U. S. 420, 442, and that "[t]he nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are

all considerations which must be taken into account".
*Ibid.* Or, to state it somewhat differently,

"The *extent* to which procedural due process must be afforded the recipient is influenced by the *extent* to which he may be condemned to suffer grievous loss . . . and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication." *Goldberg* v. *Kelly* (1970), 397 U. S. 254, 262-263 (emphasis supplied).

Weighing the serious loss to the prisoner against the prison administrators' legitimate need to maintain order and discipline in the institution, we reach several conclusions.

It is elementary that under the most rudimentary due process requirements, any hearing designed to deal with disputed facts or their application in determining punishment must be fundamentally fair, *Morgan* v. *United States* (1938), 304 U. S. 1, 14-15; *Snyder* v. *Massachusetts* (1934), 291 U. S. 97, 107-108, and designed to prevent arbitrary decision-making. *Slochower* v. *Board of Higher Education* (1956), 350 U. S. 551, 559.

We do not insist that in a custodial institution, a formal trial is necessary. Cf. *Menechino* v. *Oswald* (2nd Cir. 1970), 430 F. 2d 403. But even the most informal disciplinary hearing in the prison setting, if it is to be meaningful at all, must provide certain minimal procedural safeguards.[2] These include, as a bare minimum, the following:

---

[2] It is not the intention of this court to provide an all-encompassing detailed blueprint of procedural due process in disciplinary prison hearings in this opinion. Presumably, the limits of due process in the prison setting will be refined as experience and adversary argument directed to particular procedures within the framework of this opinion in subsequent cases are evaulated by the courts on a case-by-case basis. Thus, this court's failure to mention particular procedures is not authority for the proposition that they are not essential to due process in a prison setting.

Our discussion of the necessity of a disciplinary hearing prior to *punitive* detention is not intended to preclude *necessary*, non-punitive isolation under emergency conditions, so long as the disciplinary hearing is prompt and precedes the actual punishment.

### 1. *An impartial fact-finder.*

It is fundamental that the decision-maker cannot have an interest, by reason of his position or his bias, in the outcome of the proceeding. *In re Murchison* (1955), 349 U. S. 133, 136; *Tumey* v. *Ohio* (1927), 273 U. S. 510, 532; *Goldberg* v. *Kelly* (1970), 397 U. S. 254, 271; *Ward* v. *Monroeville* (1972), — U. S. —, 34 L. Ed. 2d 267. Thus, the jailer who instituted the discipline or whose conduct is challenged by the prisoner, cannot be the fact-finder or decision maker. Because "justice must satisfy the appearance of justice", *Offutt* v. *United States* (1954), 348 U. S. 11, 14, the prisoner "is entitled to a neutral and detached judge in the first instance", *Ward* v. *Monroeville, supra.*

Such a requirement is not unknown in the context of disciplinary prison proceedings. See *United States, ex rel. Neal* v. *Wolfe* (E. D. Pa. 1972), 346 F. Supp. 569, 574-575; *Clutchette* v. *Procunier* (N. D. Cal. 1971), 328 F. Supp. 767, 784; *Landman* v. *Royster* (E. D. Va. 1971), 333 F. Supp. 621, 653; *Morris* v. *Travisono* (D. R. I. 1970), 310 F. Supp. 857, 872.

### 2. *Notice.*

It can scarcely be disputed that "notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections", *Mullane* v. *Central Hanover Bank & Trust Co.* (1950), 339 U. S. 306, 314, is essential to a fair hearing. The notice must be in writing, identify the specific prison rule allegedly broken, and include a statement of facts upon which the specific charge is based. See *Clutchette* v. *Procunier, supra at* 782; moreover it must be personally delivered to the prisoner sufficiently in advance of the hearing to enable him to have a reasonable opportunity to prepare a defense. See *Landman* v. *Royster, supra at* 653. And he must have advance written notice of the disciplinary rules of the custodial institution[3] and the availability of these, and other hearing procedures to assist him in his defense.

---

[3] Notice of the disciplinary rules of the institution must precede the date of any alleged violation by the prisoner.

3. *The right to be heard and to present evidence.*

The right to be heard and to present evidence is indispensable to any hearing which claims to be even minimally fair. *Escoe* v. *Zerbst* (1935), 295 U. S. 490, 493; *Cole* v. *Arkansas* (1948), 333 U. S. 196, 201; *In re Oliver* (1948), 333 U. S. 257, 273. And prison disciplinary proceedings are no exception. See, *e. g., Sostre* v. *McGinnis* ('2nd Cir. 1971), 442 F. 2d 178, 198.

Thus, in the prison disciplinary context, a prisoner must be afforded an opportunity to explain his conduct and the relevant circumstances, and to present real and testimonial evidence within limits of reasonableness as to amount and relevance.

4. *The right to confrontation and cross-examination.*

While the importance of confrontation and cross-examination of adverse witnesses in formal trials has long been recognized, *Morgan* v. *United States* (1938), 304 U. S. 1, its importance to test the probative value of human statements is no less valuable in a more informal setting. Cf. *Goldberg* v. *Kelly* (1970), 397 U. S. 254, 267-268; *Greene* v. *McElroy* (1959), 360 U. S. 474, 496-497.

While it is true that permitting cross-examination of a prison guard by an inmate may be thought to interfere with the authoritarian relationship, or that identification of an inmate "squealer" gleaned from confronting an adverse witness may pose problems in the prison population, this court sees no viable alternative to permitting reasonable and relevant cross-examination by the charged inmate, if the entire hearing is not to be a mockery of form without substance.

5. *Decision based on evidence.*

It is manifest that the hearing and its procedural safeguards are designed to produce a rational, non-arbitrary decision based solely upon the evidence brought forth at the hearing. Cf. *Goldberg* v. *Kelly* (1970), 397 U. S. 254, 271; *Thompson* v. *Louisville* (1960), 362 U. S. 199, 206.

Consequently, in the context of prison disciplinary proceedings, decisions must be based upon substantial evidence adduced at the hearing and not upon other informa-

tion not offered at the hearing. Further, each decision must be in writing and must state briefly the reasons for the decision and describe the evidence upon which the decision was based. The decisions need not be lengthy or detailed, but they must demonstrate the basis for the decision. See *Rodriguez* v. *McGinnis* (N. D. N. Y. 1969), 307 F. Supp. 627.

Each of these separate elements must be present before a disciplinary hearing meets the minimal standards of procedural due process. We do not describe an administratively complex hearing, but we do describe a constitutionally compelled one. Because these petitioners had no semblance of a disciplinary hearing prior to their incarceration in the punitive segregation facility, their detention there was illegal.[4]

## II.

There is yet another reason why these detentions in the punitive segregation facility cannot stand.

The concept of double punishment for a single offense has been abhorrent to civilized persons for centuries dating as far back as the civilization of the early Greeks. The notion that one trial and one punishment are enough is one of the oldest precepts of western civilization and a cornerstone of the Anglo-American system of jurisprudence. See *Bartkus* v. *Illinois* (1959), 359 U. S. 121, 151-155 (Black, J., dissenting); *Benton* v. *Maryland* (1969), 395 U. S. 784, 795. Prohibitions against double jeopardy appear prominently in the fifth amendment to the United States Constitution, applicable to the states through the due process clause of the fourteenth, *Benton* v. *Maryland, supra,* and in the Ohio Constitution, section 10, article I.

---

[4]Respondent urges that no disciplinary hearing was required because petitioners had already been indicted, tried and convicted for their escape, were fully aware of the accusation, had been given an opportunity to explain it, and therefore had been fully afforded every element of due process by the trial court. Such an argument, that because an accused has had due process of law *once*, he may be punished *twice* for the same offense, is disingenuous, to say the least. We reject it out of hand. See discussion of double jeopardy considerations, *infra*, pp. 16-17.

By what authority, then, do the prison officials in the instant case claim the right to punish these petitioners a second time for an offense for which they were previously punished by a court of law? They urge that (a) the public interest in the safe and orderly operation of the penal institution and the prevention of escape outweighs any personal inconvenience suffered by these petitioners, and (b) the punishment was justified because it was "pursuant to standard, long-established, unvarying policy".

We find neither reason sufficient to justify judicial tolerance of behavior which had shocked the conscience of civilized man for almost two thousand years.

We do not doubt that efficient means can be devised to prevent prisoners from escaping.[5] Tyranny has frequently been efficient. But we recoil from it as we recoil from the notion of punishing, by the authority of agents of this state, a human being—albeit an inmate of a penal institution—twice for a single offense. The federal and state constitutions expressly forbid it, and prison officials should take note that this court will not tolerate it. Of course, we do not condone the forcible escape of prisoners from penal institutions, but constitutional means will have to be found to prevent it.

Moreover, the conduct of prison officials which we now condemn cannot be cured by pointing out its frequent, unvarying and hoary application in the past. For no public official, high or petty, ever acquires a license to engage in unconstitutional behavior by adverse possession.

As Mr. Chief Justice Burger has written,

". . . no one acquires a vested or protected right in violation of the Constitution by long use, even when the span of time covers our entire national existence and indeed predates it." *Walz* v. *Tax Comm'n.* (1970), 397 U. S. 664, 678.

We therefore conclude that petitioners placed in punitive detention for escaping were illegally detained in solitary confinement in violation of the Ohio Constitution, sec-

---

[5] One of them, capital punishment, is no longer a viable alternative. See *Furman* v. *Georgia*, 408 U. S. 238.

tion 10,.article I, the fifth and fourteenth amendments to the United States Constitution, a defect which no amount of procedural due process at a disciplinary hearing prior to such confinement could have cured.

For the foregoing reasons, we find it unnecessary to consider petitioners' claims of cruel and unusual punishment. The writ of habeas corpus is granted.°

*Writ granted.*

SILBERT and KRENZLER, JJ., concur.

---

°Notwithstanding that this case is moot, we feel that the issues involved are of such magnitude as to merit an opinion.